## MEMORANDUM OF POINTS AND AUTHORITIES

### 1. INTRODUCTION

Plaintiff Cesar Cortes ("Plaintiff") spent more money than he had in his checking account with University & State Employees Credit Union ("USE"). As an agreed-upon consequence of his actions, Plaintiff was assessed overdraft and nonsufficient funds ("NSF") fees. Despite his own overspending, and obtaining the benefit of that overspending, Plaintiff nonetheless seeks to further benefit to the detriment of USE by claiming that USE violated the terms of the parties' agreement. USE did no such thing, and not surprisingly, each of Plaintiff's claims fail as a matter of law.

First, Plaintiff challenges the longstanding banking practice of using the "available balance" rather than his preferred ledger account balance method, which does not account for transactions that Plaintiff has made but that have not yet cleared. He does not allege using the available balance is illegal (because it is not); rather, he erroneously contends that USE has breached its contract with members because it supposedly required use of what he calls the "ledger" or "actual" balance method to assess overdraft fees. Yet, nowhere within the parties' contract does it mention the word "actual" or "ledger," much less require it be used to assess overdrafts. To the contrary, USE consistently uses plain terms like "available" and "available funds" throughout its contract to disclose to its members that overdraft determinations are based upon a member's available balance.

Second, with respect to Plaintiff's challenge of NSF fees, Plaintiff does not – and cannot – assert any facts in support of his claim that USE can only charge a "single" fee for the "same item" regardless of the number of times a merchant requests payment for a transaction. The contract states the opposite – USE will charge an NSF fee for "each" ACH payment that is "returned unpaid" due to insufficient funds. The automated clearing house rules governing Plaintiff's challenged transactions further undermine his claim.

Nor has Plaintiff pled a viable claim under the Electronic Fund Transfer Act ("EFTA"), 12 CFR § 1005, *et seq*. ("Regulation E"). Plaintiff alleges that USE violates Regulation E because it does not accurately describe its overdraft practices in the opt-in form

Plaintiff was required to complete in order to consent to obtain certain overdraft protections. However, Plaintiff's claim is time barred because it accrued in November 2018, which is well beyond EFTA's one-year statute of limitations. In fact, all the challenged overdraft fees occurred prior to March 16, 2021 – one year before Plaintiff filed his First Amended Complaint ("FAC").  In any event, Plaintiff's Regulation E claim also fails on the merits. The Opt-In Form provides the requisite brief summary of USE's overdraft policy, especially read in tandem with the account agreement, as it must be. Even if Plaintiff was correct that the Opt-In Form is inaccurate (it is not), Plaintiff's challenge of the use of language mandated by the Federal Reserve would still fail as USE is protected by the EFTA's safe harbor provision.

Plaintiff's remaining claims are also meritless.  Plaintiff's claim for a violation of California's Unfair Competition Law ("UCL") fails as it is merely a repackaged version of Plaintiff's defective breach of contract claim. Further, USE's fee practices are not unlawful, unfair, or fraudulent. Plaintiff's claim for breach of the implied covenant of good faith fails for all the same reasons as his contract claims (the contract discloses USE's fee practices). And his quasi-contract claims cannot stand because the parties entered into an express contract governing their relationship. Finally, because Plaintiff calls into question language describing USE's fee practices and the "unfairness" of such practices, Plaintiff's state law claims are expressly preempted by federal law. Accordingly, Plaintiff's First Amended Complaint fails to state a viable claim and it should be dismissed, with prejudice.

## 2.    FACTUAL BACKGROUND

### A.    USE and the Account Documents

Plaintiff attempts to create a false narrative comparing USE to a profit-hungry bank that aims to extract illicit fees from its members. *See e.g.,* Dkt. 1, FAC ¶¶ 15, 25-26, 33, 79. USE, however, is not a bank. USE is a member-owned, not-for-profit credit union whose members consist of state employees, including faculty and staff of many of California's colleges and universities. Unlike banks, "[c]redit unions are nonprofit cooperatives, owned by their members and democratically controlled, that may only lend and pay dividends to

**MEMORANDUM OF POINTS AND AUTHORITIES**

their members and, as such, ***are disinclined by their nature and structure to engage in the kinds of practices regarded as predatory or abusive***." NCUA Opinion Letter 04-0147, National Credit Union Administration, at 3 (Feb. 10, 2004), available at: https://www.ncua.goviregulation-supervision/legal-opinions/2004/preemption-new-mexico-home-loan-protection-act (emphasis added).

As a member (FAC ¶ 5), Plaintiff's account is governed by USE's member account documents, including the Deposit Account & Services Agreement ("Account Agreement" or "Agreement"), a document titled "What You Need to Know about Overdraft Fees" ("Opt-In Form"), and the Schedule of Fees & Charges("Fee Schedule") (collectively, the "Account Documents"), which would have been collectively provided, along with other information, to Plaintiff at the time of account opening. Plaintiff only attaches the 2014 Agreement and 2014 Fee Schedule to his FAC even though he challenges fees that occurred in 2018, 2019, and 2020. *See* FAC Exs. 1-2.[1] Accordingly, USE appropriately attaches the operative versions of the Account Documents, which are integral to the FAC and incorporated by reference. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (when ruling on a motion to dismiss, "[a] court may … consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice"). Thus, attached hereto are copies of: (1) the Agreement and Fee Schedule effective on November 18, 2018, December 4, 2018, and December 31, 2018 (Exhibits A-B); (2) the Agreement effective on August 9, 2019, August 13, 2019, August 26, 2019, and May 25, 2020 (Exhibit C); and (3) the Fee Schedule effective on August 9, 2019, August 13, 2019, and August 26, 2019 (Exhibit D); and (4) the Fee Schedule effective on May 25, 2020 (Exhibit E). *See* Exs. A-E.

**B.    USE Determines Overdraft Fees Based on the Account's Available Balance**

Like most financial institutions, USE tracks the "ledger" (or "actual") balance and the "available" balance for each member's account. The ledger balance refers to the full amount of all deposits into Plaintiff's account, less payments that have been posted or fully

---

[1] Plaintiff attaches the operative version of the Opt-In Form to the FAC as Exhibit 3.

**MEMORANDUM OF POINTS AND AUTHORITIES**

processed. *Domann v. Summit Credit Union*, 18-cv-167- slc, 2018 WL 4374076, at *1-2 (W.D. Wis. Sept. 13, 2018) (citation omitted). The available balance, on the other hand, is the ledger balance minus funds for "electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled," as well as "holds on deposits that have not yet cleared." *Id*. Put another way, the available balance reflects the amount of money that a member has "available" to spend at any given time.

The Agreement provides that USE will use the available balance to determine whether a member's funds are sufficient to pay a transaction:

For those accounts to which our funds *availability* policy disclosure does not apply, you can ask us when you make a deposit when those funds will be *available* for withdrawal. An item may be returned after the funds from the deposit of that item are made *available* for withdrawal. In that case, we will reverse the credit of the item. We may determine the amount of *available funds* in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we received the item and when we return the item or send a notice in lieu of return. We need only make one determination, but if we choose to make a subsequent determination, the account balance at the subsequent time will determine whether there are *insufficient available funds.*

Ex. A at 3, Ex. C at 3 (emphasis added).[2] The Agreement clearly links a member's ability to use or withdraw funds to the member's "available funds." *Id*. The member is further directed to USE's Funds Availability Policy, which reiterates this practice and devotes an entire section to informing members when their deposits become "available" to use or for withdrawal. *Id*. at 21, *id*. at 20-21. The Agreement also includes a section titled "**WITHDRAWALS**", which explains, with clear examples, how temporary debit authorization holds affect the *availability* of a member's funds and the assessment of overdraft and NSF fees. *Id*. at 3-4, *id*. at 3-4 (amount of funds subject to a temporary hold can be adjusted based upon final settlement amount, which impacts "the amount of funds available for other transactions"). Further, if a subsequent transaction occurs while the hold is pending in an amount "greater than the funds left after the deduction of the temporary hold

---

[2] The language material to all of Plaintiff's claims was not substantially changed in the 2016 and 2019 versions of the Account Agreement and Fee Schedule.

MEMORANDUM OF POINTS AND AUTHORITIES

amount" – *i.e.*, greater than the funds available as a result of the pending transaction, that subsequent transaction will be assessed a fee. *Id*. The provided examples detail how this process occurs and when a fee is assessed due to a negative available balance. *Id*.

As an example of how the two balances work: if Plaintiff with a $100 ledger balance swipes his debit card to buy dinner for $40, USE places a pre-authorization hold on the account at the request of the restaurant. The Plaintiff's available balance is only $60, because the $40 he just spent is no longer "available" to use. His ledger balance will remain $100 until the restaurant charge is presented for payment by the merchant and posts to Plaintiff's account. Thus, like most financial institutions, USE uses the available balance to mitigate the risk that some members may fail to track debit-card spending by swiping a card and trying to use the same money to pay two different merchants – *i.e.*, spending multiples of what Plaintiff calls the "ledger" balance before the debit card transactions post.

### C.   USE's Opt-In Form and Opt-In Practices Conform with Regulation E

Regulation E prohibits the imposition of overdraft fees on ATM and one-time debit card transactions unless the financial institution, in relative part, "[p]rovides the consumer with a notice in writing . . . segregated from all other information, describing the institution's overdraft service" and obtains the consumer's affirmative consent for such overdraft coverage through the completion of an opt-in form. 12 CFR § 1005.17 (b)(1). Importantly, financial institutions are not left to their own devices when obtaining the consumer's consent and drafting the opt-in notice. Regulation E dictates the "[c]ontent and format" of the mandatory notice. 12 CFR § 1005.17(d). The financial institution must provide a notice and opt-in form that substantially conforms with the Federal Reserve's Model Form A-9 and is "segregated from all other information describing the institution's overdraft service." 12 CFR§1005.17(b)(1)(i), (b)(2)(d). The disclosure must also include a "brief description" of the financial institution's overdraft protection service, the dollar amount of any overdraft fees for ATM and one-time debit card transactions, the maximum number of daily overdraft fees that can be assessed, and an explanation of the "opt-in" requirement. 12 CFR § 1005.17(d).

To implement Regulation E, USE's Opt-In Form is a near-verbatim copy of Model

Form A-9. *Compare* FAC Ex. 3 *with* 12 CFR § 1005.17, App. A. The language in the Opt-In Form that Plaintiff challenges is taken *directly* from Model Form A-9: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." 12 CFR § 1005.17, App. A. While Regulation E provides some authority to modify or add to the language, the reference to "enough money" is not a phrase that Regulation E permits the financial institution to alter. 12 CFR § 1005.17(d)(6) (financial institutions may modify the content required with limited, defined additional information, which does not include alteration of the reference to "enough money").

**D.     USE Assesses an NSF Fee For Each Payment Returned Unpaid in Compliance with the Automated Clearing House Process and Rules**

Plaintiff also challenges USE's NSF fee practices. But this challenge cannot stand because the Agreement expressly provides that USE is entitled to charge an NSF Fee when an item is returned unpaid: "Returned Items: Items may be returned unpaid. A fee may apply (refer to the Schedule of Fees and Charges)." Ex. A at 5, Ex. C at 5. The Agreement further explains that "[a] fee applies for each item (refer to the [Fee Schedule])." *Id*. at 4, *id*. at 4. Where, as here, Plaintiff's ACH payments were presented against an insufficient account balance and had to be returned unpaid, the Agreement explains that Plaintiff is subject to a charge for each such instance. *Id*; *see also* Ex. B at 1 ("Non-sufficient Funds (NSF) . . . ***$27/each*** . . . applies to checks, Bill Pay, ACH, ATM/POS, and other electronic debits that are paid or ***returned***") (emphasis added). Thus, ***each*** NSF – or each time an item must be returned to the merchant unpaid – is subject to a $27.00 fee. *Id*.

Plaintiff's challenged NSF fees involve Automated Clearing House ("ACH") transactions, which are electronic payments that occur when a customer provides his account number and routing number to a merchant or third party to pay for goods and services. Ex. A at 16, Ex. C at 16 ("these [ACH] transfers will require you to provide the third party with your account number and credit union information"); *see also Lossia v. Flagstar Bancorp, Inc.,* 895 F.3d 423, 426-27 (6th Cir. 2018) (explaining how ACH transactions work). ACH transactions are overseen by the National Automated Clearinghouse Association

("NACHA") and governed by its Operating Guidelines ("NACHA Rules"), as accepted by Plaintiff in the Agreement. *See* Ex. A at 9, Ex. C at 9 ("You agree to be bound by automated clearing house association rules"); *see also Lossia,* 895 F.3d at 426 ("the [NACHA Rules] are the relevant payment-processing-system rules"). As the language cited above demonstrates, USE's practices are in compliance with the NACHA Rules.

In ACH transactions, Plaintiff (the "Receiver") is the one who *initiates* the process by entering into a contract authorizing the merchant (the "Originator") to introduce a transaction into the ACH network. *see also Lossia v. Flagstar Bancorp, Inc.,* 895 F.3d 423, 426-27 (6th Cir. 2018) (explaining how ACH transactions work). The Agreement advises that a Receiver "should only provide your credit union and account information . . . to trusted third parties whom you have authorized to initiate these [ACH] transfers." Ex. A at 16, Ex. C at 16. Once that authorization is provided, ***the Receiver has no other involvement in the ACH process.*** Rather, it is turned over to the Originator and the "Originating Depository Financial Institution" (*i.e.*, the merchant's bank or "ODFI") to decide when and how it will present a debit for payment. *Lossia*, 895 F.3d at 426. As the Agreement states, it is the third party that "initiates these [ACH] transfers." Ex. A at 16, Ex. C at 15. In other words, *the merchant or merchant's bank alone decide when a payment will be presented for payment. Lossia*, 895 F.3d at 426. If the member's account does not have sufficient funds to pay the requested transaction, USE may return the item back to the ODFI. *See* Nat'l Automated Clearing House Ass'n, ACH Operations Bulletin #1-2014: Questionable ACH Debit Origination: Roles and Responsibilities of ODFIs and RDFIs (Sept. 30, 2014) ("NACHA Bulletin"), available at https://www.nacha.org/news/ach-operations-bulletin-1-2014-questionable-ach-debit-origination-roles-and-responsibilities (citing NACHA Rule 2.12.4.1). If this occurs, USE is entitled to impose an NSF fee, as Plaintiff admits. FAC ¶ 99.

When, as here, an ACH transaction is returned for insufficient funds, the NACHA Rules allow merchants to initiate up to two more transactions (for a total of three attempts) to obtain payment. NACHA Bulletin (citing Rule 2.12.4); *see also White v. Bank OZK*, No. 46CV-20-152-2, 2021 WL 6098351, at *1 (Ark.Cir. Sep. 08, 2021) (explaining that when an

item is rejected for insufficient funds, the collecting party can "submit the returned item for insufficient funds a maximum of two more times for payment" under the NACHA rules). The resubmitted entry constitutes a new transaction or item with unique identifying information. *Id*. It is up to the merchant and its bank – not USE – to decide whether and when a returned item will be resubmitted for payment. *Id*. (citing NACHA Rule 2.12.4) (only the ODFI can reinitiate a previously returned transaction). The Agreement explains this to members by stating that the  member "may authorize a merchant or other payee to initiate an [ACH] transfer to collect a charge ***in the event a check or draft is returned for insufficient funds***." Ex. A at 16, Ex. C at 16 (emphasis added). In other words, Plaintiff does not need to authorize re-submission and USE plays no role in determining when, and if, a previously rejected transaction or item is re-submitted by the originating merchant. *Id*. Because USE is only on the receiving end, it evaluates each transaction or item upon the originating merchant's requests. Under the NACHA Rules, USE ***must*** "honor all debits presented" by a member's authorized merchants. *Costoso v. Bank of Am., N.A.,* 74 F. Supp. 3d 558, 571 (E.D.N.Y. 2015) (citing NACHA Rule 3.1.1; *Affinion Benefits Grp. LLC v. Econ-O-Check Corp*., 784 F. Supp. 2d 855, 876 (M.D. Tenn. 2011)). With ACH debit requests, the "Receiving Depository Financial Institution" or "RDFI" (USE), must rely on the Originator's (merchant) representation that the debits were authorized, and honor the debit request. NACHA Bulletin (citing Rule 3.1.1). While the NACHA Rules place limitations on fees that the merchant can collect due to returned transactions or items, no such restrictions are placed on USE as the receiving financial institution.

### E. NSF and Overdraft Fees Serve an Important Purpose

Plaintiff characterizes USE's fee practices as "abusive." FAC ¶ 150. However, the Office of the Comptroller of the Currency ("OCC") has long stressed the importance of these fees in preventing members from frequently spending more money than they have in their accounts:

> **Deterring of misuse by borrowers.** Certain deposit account services provided by banks, ***such as the honoring of checks drawn against nonsufficient funds, have the potential for misuse.*** It has been the Office

position that service charges should discourage customers from frequently writing checks in amounts greater than their account balances. Such a practice, if left uncontrolled, provides a customer with automatic loans. Alternatively, the bank could automatically dishonor all checks drawn on nonsufficient funds. A bank, however, may hesitate to do this because of the embarrassment to its customer. An appropriate option, the Office believes, is to establish service charges to be levied in connection with the writing of nonsufficient fund checks by borrowers to discourage customers from frequently writing such checks.

Interpretive Ruling Re Nat'l Bank Serv. Charges, 48 Fed. Reg. 54319-01, 1983 WL 110730 (1983) (emphasis added). OCC regulations require financial institutions to set fees to "deter[] . . . misuse by customers of banking services," and to "maintain[] the safety and soundness of the institution." 12 CFR § 7.4002(b)(2). NSF and overdraft fees, such as those at issue in this case, help ensure safety and soundness by deterring misuse of accounts and encourages USE members to take steps to ensure the merchant on the other side of the transaction – which has already provided goods or services – gets paid. For example, absent a second NSF fee, members have no incentive to bring accounts current, placing USE at risk and forcing it to incur unrecoverable costs for each additional payment request. Similarly, if no fee were assessed for overdrawing their account, members would not be deterred from constant overspending.

Moreover, overdraft fees are not predatory as Plaintiff seems to suggest. FAC ¶¶ 23-26. Overdraft fees allow USE to provide its members with free checking account services with zero or low minimum balance requirements, which encourages account ownership and retention among low-income households. A recent study by the Federal Reserve of New York demonstrates that overdraft fees improve, rather than hinder, financial inclusion. *See* Jennifer L. Dlugosz, Brian T. Melzer, Donald P. Morgan, *Who Pays the Price? Overdraft Fee Ceilings and the Unbanked*, Federal Reserve Bank of New York Staff Report No. 973, June 2021. The study found that when a financial institution is constrained by overdraft fee limits, it "reduce[s] overdraft coverage and deposit supply, causing more returned checks and a decline in account ownership among low-income households." *Id.* at 22. Low-income

households prefer being banked and are both "more likely to open accounts [and] less likely to lose them" when overdraft fee limits are relaxed. *Id*. Thus, contrary to Plaintiff's rhetoric, USE's fee practices are not "abusive" or predatory, but instead foster financial inclusion by allowing USE to make its services more accessible.

### F.   Plaintiff's Account and Allegations Relating to His Account

Plaintiff filed his initial complaint in state court on June 2, 2020. On March 17, 2022, Plaintiff filed his FAC, alleging a breach of contract based on the Account Agreement, a breach of contract based on the Opt-In Form, a breach of the implied covenant of good faith and fair dealing, unjust enrichment, money had and received, violation of UCL, and a violation of Regulation E based on USE's purportedly improper assessment of overdraft and NSF fees. FAC ¶¶ 116-164. On April 4, 2022, the case was removed to this Court.

#### i.   *Plaintiff's Allegations Regarding Overdraft Fees.*

Plaintiff's allegations regarding the specific overdraft fees assessed to his account that purportedly breached the contract and are also in violation of Regulation E are sparse. Plaintiff alleges only that on or around November 18, 2018, December 4, 2018, December 31, 2018, August 26, 2019, and May 25, 2020, he was assessed overdraft fees even though his account had a "positive balance." FAC ¶ 98.  Plaintiff alleges that this assessment of overdraft fees also violated Regulation E because USE purportedly failed to accurately describe its overdraft practices in its Opt-In Form.

#### ii.   *Plaintiff's Allegations Regarding NSF Fees.*

Plaintiff alleges that USE improperly assessed NSF fees related to ACH transactions attempted by a specific merchant – Barclaycard US. FAC ¶ 99 (emphasis omitted). Plaintiff does not allege anywhere in the FAC that he did not authorize Barclaycard US to make ACH debit requests against his USE account, nor does he allege that he had sufficient funds in his account to pay the transactions. Rather, he alleges only that Barclaycard US attempted a payment on August 9, 2019, that was returned for insufficient funds, and resulted in the assessment of a $27 NSF fee. FAC ¶ 99. Several days later, on August 13, 2019, Barclaycard US initiated another ACH transaction to receive payment. *Id.* This too was rejected because

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff lacked sufficient funds in his account at the time the transaction was presented for payment, resulting in the assessment of another $27 NSF fee. *Id*. Plaintiff does not dispute USE's right to return the payment attempt. *Id*. But he alleges that he should not have received a second NSF fee because, as he sees things, the second transaction by the merchant was the "same item" as the previously rejected transaction. *Id*.

## 3. LEGAL STANDARD FOR DISMISSAL

Dismissal under Rule 12(b)(6) is proper where there is either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. Fed. R. Civ. P. 12(b)(6); *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990). To survive a Rule 12(b)(6), a plaintiff must plead "facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). In doing so, a plaintiff must provide more than just speculative allegations and must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 545. Indeed, courts do not accept conclusory allegations of law as true. *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986). Under this standard, Plaintiff's FAC cannot survive dismissal.

## 4. PLAINTIFF'S BREACH OF CONTRACT CLAIMS FAIL

To prevail on a breach of contract claim, a plaintiff must demonstrate: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Hamilton v. Greenwich Invs. XXVI, LLC,* 195 Cal. App. 4th 1602, 1614 (2011) (citation omitted). There is no dispute that a contract exists between USE and Plaintiff, but Plaintiff's claim falls short on the second element because he has failed to identify any express promise that USE breached. Plaintiff attempts to conjure supposed breach of contract claims, but ultimately seeks to punish USE for its lawful imposition of fees when he repeatedly failed to adequately monitor his spending. As one federal court so aptly noted, "credit unions are now being forced to defend membership agreements and overdraft fee disclosures . . . ***even though the consumers incurring the penalties literally appear to be spending more money than they actually have***." *Rader v.*

*Sandia Lab. Fed. Credit Union*, No. CV 20-559 JAP/JHR, 2021 WL 1533664, at *1 (D.N.M. Apr. 19, 2021) (emphasis added).; *see also White*, 2021 WL 6098351, at *1 ("To avoid fees being assessed, account holders should have funds sufficient to cover the amounts they authorize"). Accordingly, the *Rader* court granted the motion to dismiss in its entirety. This Court, too, should not condone Plaintiff's lack of financial responsibility especially in light of the contractual provisions negating her claims, and dismiss Plaintiff's claims.

### A. The Opt-In Form is Not a "Standalone" Agreement

Plaintiff cannot allege a separate claim for breach of the Opt-In Form because it must be read in conjunction with the Agreement. "California courts will consider multiple writings between the relevant parties together and apply them as a whole where they make up parts of the same transaction." *Language Line Servs., Inc. v. Language Servs. Assocs., LLC*, No. C 10-02605 JW, 2011 WL 13153247, at *7 (N.D. Cal. Mar. 17, 2011). The Agreement governs Plaintiff's account and his banking relationship with USE. FAC ¶ 117. The Opt-In Form is an add-on to that agreement that further describes USE's overdraft practices. In *Rader*, the court explained that the Agreement and Opt-In Form must be read as a whole because "both instruments concern the same subject matter (overdrafts)." *Rader*, 2021 WL 1533664, at *4. As is the case here. The Agreement specifically states that USE offers "overdraft services" and further explains that a member may opt-in for these services. Ex. A at 5, Ex. C at 4. In turn, USE employs the Opt-In Form to explain its "overdraft services" and capture a member's affirmative consent to the services. *Id*. Ex. F at 1. Because the Agreement and Opt-In Form concern the same subject matter, they must be read together. *Rader*, 2021 WL 1533664, at *4 (construing opt-in form and account agreement together); *Domann*, 2018 WL 4374076, at *6–7 (same); *Chambers v. NASA Fed.  Credit Union*, 222 F. Supp. 3d 1, 11 (D.D.C. 2016) (same). Thus, the "enough money" language of the Opt-in Form must be construed to mean the "available balance" method set forth in the Agreement.

Plaintiff's reference to USE's Opt-In Form as a "standalone" agreement (FAC ¶¶ 41, 126) misconstrues Regulation E, which never refers to the word "agreement," but instead describes the Opt-In Form as a "notice" or "disclosure." 12 CFR §§ 1005.17(b)(1)(i),

1005.17(d)(4). As a notice, the Opt-In Form's purpose is to explain USE's overdraft protection service "in a clear and readily understandable way" so that members can make an informed decision about whether to opt-in to overdraft protection for ATM and one-time debit card transactions. 74 Fed. Reg. 59033-01, 59048.

As mandated by Regulation E, USE was required to issue a notice with a "brief description" of its overdraft services separately from the Agreement. The reason Regulation E requires that the Opt-In Form be segregated is to "ensure that opt-in information is not buried or obscured within other account documents and overlooked by the consumer." 74 Fed. Reg. at 59041. Contrary to Plaintiff's reference to the Opt-In Form as a "standalone document, Regulation E does not require a separate, all-encompassing contract that defines every applicable term for overdraft protection. *See Rader*, 2021 WL 1533664, at *4 (explaining that the opt-in form and agreement "were divorced in accordance with federal law . . . and not because the parties intended them to stand alone"). Rather, it simply requires a "notice" setting forth a "brief description" of overdraft services, which is exactly what the Opt-In Form accomplishes. Plaintiff concedes that, "[f]inancial institutions are not permitted to include any additional information in the Opt-In [Form] unless specifically authorized by Regulation E." FAC ¶ 42. Thus, USE is limited in what it can provide in the Opt-In Form but provides the members with complete details governing their account, including overdrafts, in the Agreement.

### B. The Agreement States that USE Authorizes Withdrawals and Transactions Based Upon a Member's "Available Funds."

Even though the term "ledger" never appears in the Agreement, Plaintiff alleges USE breached the Agreement by assessing overdrafts based upon a member's available balance and not all of the money in the account without deductions for holds on pending transactions or deposits. FAC ¶ 92. What does appear in the Agreement is a repeated reference to "available funds" or an amount of funds "available." Given this, the only plausible interpretation of the Agreement that properly gives effect to the entire contract is that overdraft determinations are made based upon the account's available balance.

Plaintiff repeatedly refers to the available balance as an "artificial" balance. FAC ¶¶ 30-32. This claim is patently misleading. "Available balance" is a well-established industry term and is commonly used as a method to calculate an account holder's checking account balance. *Domann*, 2018 WL 4374076, at *1 (citing the CFPB, Winter 2015 Supervisory Highlights) ("Financial institutions primarily use two methods to calculate an accountholder's checking account balance: the 'ledger' balance and the 'available' balance"). Any argument by Plaintiff that the term "available" is "ambiguous" because it is not defined also lacks merit. According to California's rules of contract construction, if "available" is not defined in the Agreement, it is presumed to bear its ordinary, popular meaning. *Butler v. City of Palos Verdes Ests.,* 135 Cal. App. 4th 174, 181 (2005) ("words of a contract are to be understood in their ordinary and popular sense"). The definition relevant here is the first and most obvious one: "present or ready for immediate use," or "present and ready for use, at hand, accessible." Merriam-Webster, Available, https://www.merriam-webster.com/dictionary/available. There is no reasonable construction of the Agreement under which funds that a member has already committed to one transaction – including debits that have not technically cleared – are "available" to use for another transaction.

The term "available" is used to modify the word "funds" several times throughout the Agreement. *See e.g.,* Ex. A at 3 ("We may determine the amount of ***available funds*** in your account. For the purpose of deciding whether to return an item for insufficient funds . . . "); *id.* at 4 ("the amount of ***funds in your account available*** for other transactions will be reduced by the temporary hold . . . "). If "available balance" meant all of the funds in an account, there would be no need to use the modifier "available." *See Chambers*, 222 F. Supp. 3d 1 at 11 (rejecting argument that "available" balance means "actual" balance); *see also Domann,* 2018 WL 4374076, at *6–7 ("If this term meant 'all of the funds' in the member's account, as [plaintiff] urges, then the adjective 'available' would be meaningless and unnecessary"). The only way to interpret the Agreement the way Plaintiff posits would be to ignore the word "available," violating the cardinal rule of contract interpretation. *In re Tobacco Cases I,* 186 Cal. App. 4th 42, 49 (2010) (courts "must give significance to every

word of a contract . . .  and avoid an interpretation that renders a word surplusage").

The conclusion that "available" means something other than "actual" (or "ledger") is spelled out in the contract itself.  USE's Funds Availability Policy clearly informs members that there may be a difference between the actual balance on a member's account and the amount of funds that are "available" for the member to use.  Ex. A at 21, Ex. C at 20. Plaintiff's claim cannot be saved by his misguided belief that overdrafts can only be determined based upon "the money actually in the account", *i.e.*, the ledger balance.  FAC ¶ 28. This position is belied by the Agreement's inclusion of detailed information advising members how temporary debit authorizations holds impact the member's availability of funds and impact the assessment of fees. Ex. A at 4, Ex. C at 3-4. The determination of overdraft fees cannot possibly be based on the ledger balance because the Agreement explicitly discloses that pending transactions reduce the funds, and a subsequent transaction may be assessed a fee because funds subject to a hold are not available to spend. Indeed, Plaintiff admits that this language clearly provides for the use of the available balance. In referencing contractual language from other financial institutions that, according to Plaintiff, more expressly "disclosed their use of the available balance," Plaintiff essentially concedes that USE's Agreement is clear and unambiguous because it uses similar or better language. *See* FAC ¶¶ 45-54. For example, Plaintiff cites to language used by another credit union that is ***identical*** to USE's "[a] temporary debit authorization hold affects your account balance" language. *Compare* FAC ¶ 46 *with* Ex. A at 4. Because USE's Agreement uses the same (or even better) language as the examples provided by Plaintiff, he has failed to allege that USE's method of using the available balance to assess overdraft fees violated the terms of the Agreement.

Thus, when an account agreement "refers to 'available' funds, it must be referring to a subset of funds unencumbered by such restrictions – exactly the type of restrictions that can create a divergence between the actual and available balances in the first place." *See Chambers*, 222 F. Supp. 3d at 11. In simple terms, for there to be "available funds" in an account, there must also be "unavailable funds" in that same account. If, as Plaintiff claims,

USE may not consider the funds on hold due to a pending transaction when determining an overdraft, the Funds Availability Policy is rendered a nullity because the holds on deposits will have no impact on whether a member may spend the full amount without overdrawing. That is exactly why the District Court of New Mexico dismissed a breach of contract claim based on the same theory of liability in *Rader*. 2021 WL 1533664. The court found the plaintiff's argument that the contract did not explain or define the account balance method to be unpersuasive because such an argument would require the court to ignore the Funds Availability Policy, which explains a member's ability to withdraw funds based on their ***availability***. *Id*. at *7-8. The *Rader* court also found that the agreement "unambiguously convey[s] that the available balance method applies" because it clearly features the modifying term "available" in relation to "funds." *Id*. at *6. As is the case here, which is why dismissal of Plaintiff's claim is warranted.

## C.   The Agreement Expressly Entitles USE to Charge a Fee Each Time an Item is "Returned Unpaid" Due to Insufficient Funds

Plaintiff also alleges that USE breached the Agreement by assessing more than one NSF fee on "the same item." FAC ¶ 81. Plaintiff's so-called prohibition on charging multiple NSF fees is a fiction created by his counsel; it is not anywhere in the Agreement. By stating that, "[i]tems may be returned unpaid" and "a fee applies for each item," the Agreement clearly informed Plaintiff that he would incur an NSF fee each time an item is returned unpaid to the merchant. That is exactly what happened to him in August 2019. Plaintiff's merchant twice presented an ACH debit to USE for payment. FAC ¶ 99. On both occasions, Plaintiff did not have enough money in his account to pay his merchant. *Id*. And on both occasions, USE returned the item unpaid and charged Plaintiff an NSF Fee. *Id*.

According to Plaintiff, the Agreement purportedly indicates that a "single [NSF] Fee" may be assessed on each returned item or transaction. FAC ¶ 83. However, Plaintiff does not cite or point to any language in ***any*** document promising that USE will only charge a "single" NSF fee regardless of the number of times a merchant requests payment. In fact, even though Plaintiff repeatedly alleges that USE indicates that only a "single" fee will be

charged, the Court will look in vain for this promise because neither the Agreement nor the Fee Schedule ever use the word "single" in the context of fees. *See Fenton* v. Tri-County Bank and Trust Co., No. 67C01-2010-PL-607, 2020 WL 8673276, at *1 (Ind. Cir. Dec. 29, 2020) (rejecting the same argument and threatening sanctions "for falsely stating to the court that the word 'single' appears in the bank contract when it does not"); *see also White*, 2021 WL 6098351, at *1 (noting that the contract does not state that "a single fee" will be assessed for a returned item and that "[t]he word single is added by the Plaintiffs' into the contract"). Here, Plaintiff's interpretation invites the Court to insert language into the contract – a request incompatible with California law. *See Levi Strauss & Co. v. Aetna Cas. & Sur. Co.*, 184 Cal. App. 3d 1479, 1486 (1986) (courts "cannot insert in the contract language which one of the parties now wishes were there").

Plaintiff attempts to save his claim by suggesting that at the very least the term "item" is ambiguous. Even assuming a second request for payment is the same item (it is not), unfortunately for Plaintiff, the contract does not contain any limiting language that only one NSF fee may be assessed "per item." FAC ¶ 24. That is exactly why, in a similar case based on the same theory of liability, the Southern District of Texas ruled that "even if the word 'item' is ambiguous, there is no reasonable interpretation of the Agreement that can be construed as limiting [the credit union] to charging one NSF fee per item." *Ross v. Navy Army Community Credit Union, et. al.*, No. 2:21-CV-168, 2022 WL 100110, at *4 (S.D. Tex. Jan. 11, 2022). The court concluded that the "language is indifferent to how many times an 'item' has been presented and rejected" and ***"does not place a limit on how many fees [the credit union] may charge if an item is presented multiple times and an accountholder lacks sufficient funds."*** *Id*. (emphasis added). Likewise, here, there is no reasonable interpretation of the Agreement that would preclude USE from assessing an NSF fee each time an item was returned unpaid even if it was the same item each time.

Regardless of the definition of "item," the Agreement clearly states that if the item is "returned unpaid," USE will apply a fee for each such instance, *i.e.*, each time an item is returned unpaid. Ex. A at 5, Ex. C at 5. Thus, the applicability of fees is not determined each

time a member authorizes a merchant to seek payment, but rather is triggered by the number of times and transaction must be returned due to insufficient funds. That is, if the item is "returned unpaid" to the merchant as NSF because a member's account does not have funds to pay a transaction for which he already received a benefit, USE will charge an NSF fee. That is exactly what USE does, and that is exactly what the fee schedule says: each "returned unpaid" item incurs a $27.00 fee. Ex. B at 1, Ex. D at 1. Once a debit request is returned, it is up to the Originator or merchant – not USE – whether and when the debit will be presented a second time for payment. At the point this new transaction (with a new transaction number) is "presented" for payment, USE determines whether the member has sufficient funds to pay the debit. If he does not, the item will be "returned unpaid," and the member will be charged an NSF fee.

This Court must also reject Plaintiff's attempt to create ambiguity by referencing contractual language from other financial institutions that, according to Plaintiff, more expressly describe their fee practices. FAC ¶¶ 55-67. Not only does this strategy demonstrate that Plaintiff's claims are subject to preemption, as discussed below, but further, as the Southern District of Texas explained, "Plaintiff cannot use disclosures from other financial institutions to show that the Account Agreement is ambiguous." *Ross*, 2022 WL 100110, at *4. Thus, Plaintiff's breach of contract claim should be dismissed.

Moreover, Plaintiff's suggested interpretation of "item" is wrong and was expressly rejected by the Eastern District of Virginia in *Lambert v. Navy Fed. Credit Union*, 2019 WL 3843064, at *3-5 (E.D. Va. Aug. 14, 2019). In *Lambert,* the court held that each time a merchant presented a debit request for payment of an invoice owed by the plaintiff, it was a separate "item" or "transaction." *Id*. at *4. More specifically, noting that it was the merchant who submitted a debit request the second time, the *Lambert* court held that "[w]hen Plaintiff's insurer 're-presented' the request for payment, it was a new ACH debit item just as a second check would be a new check even if it was by the same merchant, in the same amount, for the same purpose – and was therefore eligible for a fee when it was returned for nonsufficient funds." *Id*. Accordingly, under *Lambert,* each transaction would be a separate

"item" even if it related to Plaintiff's attempt to pay a single invoice.

The NACHA Rules confirm that for ACH payments, every "request for the withdrawal of money from the deposit account" is a debit "entry," and that "each debit entry shall be deemed an 'item.'" *Diane Sales, Inc. v. Am. Express Centurion Bank*, No. CV GLR-14-1063, 2014 WL 11429026, *2 (D. Md. July 14, 2014) (quoting the NACHA Rules). The NACHA Rules make it clear that Plaintiff plays no role in the actual ACH debit transaction. The merchant is the one who directs a request for payment through an ACH debit transfer to USE. Other than giving the merchant days, months, or even years earlier the authority to later request the ACH transfer, Plaintiff is not involved at the time of the actual ACH debit request at all. Plaintiff's lack of involvement is not surprising because he is not part of the ACH system and has no access to the ACH network. Thus, Plaintiff's attempt to define "item" as a customer request for payment or transfer is unreasonable because the customer is not even involved in the actual ACH transaction.

Plaintiff's limited involvement in providing initial authority to the merchant to later seek an ACH transfer is also entirely irrelevant to the subsequent ACH transfer. Under the NACHA Rules, USE relies on the ODFI's warranties and does not (and cannot) delve into the question of authorization at the time of presentment. *Costoso v. Bank of Am., N.A.*, 74 F. Supp. 3d 558, 570-71 (E.D.N.Y. 2015); *see also* NACHA Bulletin. USE *must* "honor all debits presented" by a member's authorized merchants, regardless of whether Plaintiff authorized the debit. *Id.* (citing NACHA Rule 3.1.1; *Affinion Benefits Grp. LLC v. Econ-O-Check Corp.*, 784 F. Supp. 2d 855, 876 (M.D. Tenn. 2011)). USE has no direct relationship with the merchant seeking payment; the relationship, or contract to pay, is between Plaintiff and his merchants. As such, USE would have "no basis to know whether any specific ACH debit entry has been properly authorized," and thus, Plaintiff's intent or even his authorization is entirely irrelevant at the point in the process where payment is sought from USE. NACHA Bulletin, *supra*. Accordingly, under the NACHA Rules, every merchant's ACH request for payment from USE – even if the payment request is for the same underlying purchase – is a ***new*** transaction, subject to a ***new*** fee because USE is required to

process the new request. *See Winamaki*, 2020 WL 6861466, at *2 ("The NACHA rules require [the bank] to process those re-submitted transactions").

Relying on the NACHA rules and the parties' contract, a court in Arkansas recently rejected the same theory of liability. In dismissing plaintiff's claim, the court explained:

> ***The Defendant Bank does not have control over the collecting party or the resubmission process.*** The rules allow for resubmission and if Plaintiffs had deposited sufficient funds after the original denial, the Defendant would have paid the collecting party and no other fees assessed. ***The Plaintiffs failure to have sufficient funds in the account is the reason for the denial of payment and the fee charged each time the payment is rejected by the Defendant for insufficient funds.***

*White*, 2021 WL 6098351, at *1 (emphasis added).  Thus, the plain and unambiguous terms of the Agreement coupled with the NACHA Rules conclusively demonstrate that Plaintiff's breach of contract claim fails as a matter of law.

## 5.  PLAINTIFF'S REGULATION E CLAIM FAILS AS A MATTER OF LAW

Plaintiff claims that USE violated Regulation E by failing to obtain his affirmative consent to charge overdraft fees on one-time debit card transactions because USE did not accurately describe its overdraft policy in the Opt-In Form. FAC ¶¶ 158-64. This argument fails for three reasons: (1) it is time barred; (2) USE's Opt-In Form is clear; and (3) USE is protected from liability by the EFTA's safe harbor.

### A. Plaintiff's Claim is Time-Barred

Plaintiff's Regulation E claim is governed by the EFTA's one-year statute of limitations, requiring that claims must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1693m(g); *see also Park v. Webloyalty.com, Inc.*, No. 12CV1380-LAB JMA, 2014 WL 4829465, at *5 (S.D. Cal. Sept. 29, 2014), *aff'd*, 685 F. App'x 589 (9th Cir. 2017). Thus, an EFTA claim accrues as soon as the first fee is charged after an alleged failure to obtain proper authorization pursuant to Regulation E. *See e.g.*, *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 350 (D.N.H. 2018) ("[EFTA's] limitation period is triggered when a financial institution makes a first unauthorized transfer or a fee assessment is paid."); *Whittington v. Mobiloil Federal Credit*

*Union*, No. 1:16-CV0-482, 2017 WL 6988193, at *13 (E.D. Tex. Sept. 14, 2017), *aff'd* 780 Fed. Appx. 171 (5th Cir. 2019) (EFTA claim arising out of overdraft fees accrues when the defendant first "assessed a purportedly improper overdraft fee").

Plaintiff does not allege facts to show when he signed the Opt-In Form. He does allege, however, that he was charged overdraft fees, based on the Opt-In Form, on five occasions between November 30, 2018, and May 25, 2020. Plaintiff raised his Regulation E claim for the first time when he filed his FAC on March 17, 2022, *more than three years after the first assessment of a purportedly improper overdraft fee*. Plaintiff's EFTA claim is thus barred by the applicable one-year statute of limitations. *See Rader*, 2021 WL 1533664 at *10 (finding plaintiff's EFTA claim barred because plaintiff filed suit "approximately eighteen months after the first overdraft penalty").

Plaintiff cannot use the discovery rule to save his time-barred claim. "Under the discovery rule, the limitations period does not begin to run until the plaintiff discovers (or reasonably should discover) that [he] has been injured." *Harvey v. Google Inc.*, No. 15-CV-03590-EMC, 2015 WL 9268125, at *4 (N.D. Cal. Dec. 21, 2015). In other words, the discovery rule requires the Plaintiff to use due diligence in discovering the basis for the claim. *Id*. The Agreement informs Plaintiff and other USE members that it is the member's obligation to examine his monthly account statements. Ex. A at 7, Ex. C at 7. Had Plaintiff exercised reasonable diligence, he would have discovered the alleged injuries of which he complains in his EFTA claim no later than December of 2018, when he received his monthly statement showing his transactions from November of that year (including the first of the overdraft fees of which he complains). Thus, even if the Court were to apply the discovery rule to Plaintiff's claim, the one-year statute of limitations would have expired long before Plaintiff filed his FAC in March 2022. *See Harvey*, 2015 WL 9268125 at *4 (dismissing EFTA claim because even if the discovery rule applied, "[i]f [plaintiff] had exercised due diligence, she should have discovered the injury either by . . . simply, looking at her bank statements").

Nor can Plaintiff save his claim by invoking the continuing violation doctrine. The

**MEMORANDUM OF POINTS AND AUTHORITIES**

doctrine does not apply to a purported violation of Regulation E where, as here, a "single event gives rise to continuing injuries." *Whittington*, 2017 WL 6988193, at *13 (citation omitted); *Domann*, 2018 WL 4374076, at *9-10 (collecting cases rejecting the continuing violation theory as applied to the EFTA and Regulation E). And even if it did apply, it would not save Plaintiff's untimely claim because he has not pled *any* purportedly improperly assessed overdraft fee that occurred within the one-year limitations period. The latest purportedly improper assessment of an overdraft fee occurred in May 2020, approximately two years before the filing of the FAC, which is still well outside the limitations period. Accordingly, Plaintiff's Regulation E claim cannot stand.

### B.     The Opt-In Form Clearly Describes USE's Overdraft Practices

Even if Plaintiff's Regulation E claim was not time barred, it would nonetheless fail on the merits. As explained above, when read in conjunction with the Agreement, as it must be, the Opt-in Form accurately describes USE's overdraft practices. *See* Section 4B *supra*. Accordingly, when reading these documents logically together, there is only one plausible conception of the foregoing language – if a member does not have enough "available funds" to pay a transaction, then his account is overdrawn and subject to an overdraft fee.

Plaintiff's contention that the use of the phrase "enough money" in the Opt-In Form must mean the ledger balance is belied by the Federal Reserve's knowledge and expectation that financial institutions commonly determine overdrafts on the basis of the available balance. In rejecting a proposed rule that would have placed limits on overdraft fees caused by debit holds, the Federal Reserve explained that it declined to adopt the proposal because, among other things, it was "persuaded that addressing overdrafts caused by *debit holds* raises significant operational issues." 74 Fed. Reg. 59049-50 (Nov. 17, 2009) (emphasis added). Only the available balance and not the ledger balance reflects debit holds. As such, the Federal Reserve has always recognized that financial institutions typically do and may impose overdraft fees on the available balance. *Id*.

Regulation E, which requires the use of the Opt-In Form, contemplates an overdraft will occur if the member lacks funds *available* to use to cover a transaction. *See* 12 CFR §

205.17 (A financial institution may assess "a fee or charge on a consumer's account . . . when the consumer has insufficient or unavailable funds in the account.") (emphasis added); *see also* Regulation E Final Rule, 74 Fed. Reg. 59033-01 (Nov. 17, 2009) ("Under network rules, financial institutions must pay authorized debit card transactions, even if at settlement intervening transactions by the consumer have reduced the consumer's available balance below the authorized amount of the transaction" and "institutions may debit the consumer's account for the amount of the overdraft"). Accordingly, the Opt-In Form clearly and accurately describes USE's overdraft practices.

### C.     USE is Insulated from Liability

Plaintiff's Regulation E claim also fails because USE is shielded from liability by the EFTA's safe harbor provision, which provides that no liability shall be imposed for "any failure to make disclosure in proper form if a financial institutions utilized an appropriate model clause issued by the Bureau or Board." 15 U.S.C. § 1693m(d)(2); *see also Tilley v. Mountain Am. Fed Credit Union*, No. 217CV01120JNPBCW, 2018 WL 4600655, at *2 (D. Utah Sept. 25, 2018) (dismissing EFTA claim because credit union was insulated from liability by EFTA's safe harbor provision); *Rader*, 2021 WL 1533664, at *14 (same). Here, Plaintiff does not – and cannot – allege that USE altered the language of Model Form A-9 in any impermissible way. "[I]f a financial institution uses model language provided by the Bureau [in Model Form A-9] to make a disclosure, it is shielded from liability claims that the disclosure is deficient." *Tilley*, 2018 WL 4600655, at *4-5; *Rader*, 2021 WL 1533664, at *13-41. Because USE's Opt-In Form is based on and is substantially similar to Model Form A-9, USE cannot be liable under the EFTA.

## 6.  PLAINTIFF'S UCL CLAIM FAILS AS A MATTER OF LAW

Based on the same conduct alleged in support of his contract and Regulation E claims, Plaintiff alleges that USE violated the "unlawful" and "unfair" prongs of the UCL. FAC ¶¶ 147-56. Plaintiff's UCL claim should be dismissed for two reasons.

First, Plaintiff's UCL claim should be dismissed because it is nothing more than a breach of contract claim clothed as a violation of the UCL. It is well settled that something

more than a breach of contract is required to make up a valid claim under the UCL. *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1161 (9th Cir. 2016) (affirming dismissal of unfair and unlawful UCL prong claims based on breach of contract claims); *Forever 21, Inc. v. Nat'l Stores Inc.*, No. 2:12:CV-10807-ODW, 2014 WL 722030, at *5 (C.D. Cal. Feb. 24, 2014) (dismissing UCL claim where "the allegations are merely a repackaged version of . . . [a] defective breach-of-contract claim"). A plaintiff may state a UCL claim premised on a breach of contract *only* "when the act is unfair, unlawful or fraudulent for some additional reason." *Boland v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d 1094, 1110 (E.D. Cal. 2010). Here, Plaintiff's UCL claim reiterates his breach of contract claims; he has not plead some other reason that any of USE's conduct amounts to a UCL violation. *Compare* FAC ¶ 123 *with id.* ¶ 149. Thus, Plaintiff cannot state a UCL claim because his UCL claim is based on the same conduct and injury underlying his alleged breach of contract claims.

Plaintiff's UCL claim reiterates his breach of contract claims; he has not plead some other reason that any of USE's conduct amounts to a UCL violation. *Compare* FAC ¶ 123 ("Defendant breached the terms of the Account Agreement by, *inter alia*, assessing overdraft or NSF fees when there was enough money in the account to cover the transaction and by assessing multiple fees for the same electronic transaction or item"), *with id.* ¶ 149 (alleging violation of "unfairness" prong of the UCL because "Defendant charges overdraft or NSF fees when there is enough money in an account to cover a transaction or by charging multiple fees for the same electronic item"). Because Plaintiff's UCL claim is based on the same conduct and injury underlying his alleged breach of contract claims and resulted in the same purported harm, he cannot state a UCL. *Forever 21, Inc.*, 2014 WL 722030, at *5.

Second, Plaintiff's UCL claim should be dismissed because USE's practices were not unlawful, unfair, or fraudulent. The Agreement clearly articulated the terms for the assessment of overdraft and NSF fees. And while Plaintiff falsely paints a narrative that USE uses deceptive fee practices for monetary gain, as discussed in Section 2E, *supra*, USE's practices are purposed to encourage members to properly manage their accounts.

## 7. PLAINTIFF'S CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH FAILS.

Plaintiff's breach of the implied covenant of good faith and fair dealing claim is based on the same allegations that underlie his breach of contract claim – *i.e.*, that USE improperly assessed overdraft and NSF fees. FAC ¶ 138. This claim fails because the implied covenant of good faith and fair dealing "is limited to assuring compliance with the *express terms* of the contract and cannot be extended to create obligations not contemplated by the contract." *Pasadena Live, LLC v. City of Pasadena*, 114 Cal. App. 4th 1089, 1094 (2004) (citation omitted). Because the Agreement permitted USE to engage in the fee practices challenged by Plaintiff, his implied covenant claim fails as a matter of law. Moreover, because Plaintiff's claim is based on the same allegations and seeks the same relief as the breach of contract claim, it should be "disregarded as superfluous as no additional claim is actually stated." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc*., 222 Cal. App. 3d 1371, 1395 (1990).

## 8. Plaintiff's Claims for Unjust Enrichment and Money Had and Received Fails

Plaintiff's quasi-contract claims for unjust enrichment and money had and received should be dismissed because such claims are impermissible where, as here, there is a valid, express contract which governs the dispute. *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996); *see also Allen v. Hylands, Inc.,* No. CV 12-01150 DMG MANX, 2012 WL 1656750, at *5 (C.D. Cal. May 2, 2012) ("a plaintiff may not maintain quasi-contract claims such as unjust enrichment, money had and received . . . 'if the parties have an enforceable agreement regarding a particular subject matter'") (citation omitted).

Here, there is no dispute that there exists a governing contract between the parties - the very same Agreement on which Plaintiff relies on in bringing his contract claim. Plaintiff's claims for unjust enrichment and money had and received do not contain any independent allegations beyond USE's alleged improper assessment of fees in violation of the contract. FAC ¶¶ 141-145. ; *see also* FAC ¶¶ 140, 143 (incorporating breach of contract allegations into quasi-contract claims). Based on the existence of the Agreement, Plaintiff's claims for unjust enrichment and money had and received are precluded and must be dismissed.

**MEMORANDUM OF POINTS AND AUTHORITIES**

*Langley Partners, L.P. v. Tripath Tech., Inc.*, No. C-05-4194 SC, 2006 WL 563053, at \*7 (N.D. Cal. Mar. 7, 2006) (finding that plaintiff's quasi-contract claims were not "legally feasible" because the parties had a valid and enforceable contract).

### 9.   PLAINTIFF'S STATE LAW CLAIMS ARE PREEMPTED.

Plaintiff spends several pages quoting disclosures from other financial institutions he believes USE should have mimicked to better disclose overdraft and NSF fees. FAC ¶¶ 46-72. Plaintiff also states that USE's fee practices are "unfair." *Id*. ¶¶ 25, 32, 34, 149-50. The gravamen of Plaintiff's claims is that USE is liable for not making particular disclosures and that its fee practices are "unfair."   These allegations, and Plaintiff's claims for breach of contract, violation of the UCL, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and money had and money received, are preempted by federal law. As a federally-insured credit union, USE is governed by the National Credit Union Association's Truth in Savings Act ("TISA"), 12 CFR Part 707. TISA regulations require credit unions to provide disclosures regarding the amount of fees and conditions under which fees may be imposed. *See* 12 CFR § 707.4(b)(4). Congress, through the TISA, expressly preempted any "[s]tate law requirements that are inconsistent with the requirements of the TISA and [its implementing regulations]." 12 CFR § 707.1(d).

These regulations foreclose any attempt by a plaintiff to use state law to attack the fairness of a credit union's fee practices or to mandate specific language that must be used to adequately disclose its fee practices. *See e.g., Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 730 (9th Cir. 2012) (holding that UCL claim based on the allegation that overdraft fees were "unfair" was preempted by federal law); *Whittington*, 2017 WL 6988193 at \*9 (finding plaintiff's "attempts to use a state consumer law to dictate to a federal credit union what fees it may charge and how it may charge them" were preempted); *Lambert*, 2019 WL 3843064, at \*2-3 (state law claims purporting to dictate credit union overdraft disclosures were preempted by federal law).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**10.    CONCLUSION**

Based on the foregoing, USE respectfully requests the Court dismiss the First Amended Complaint filed by Plaintiff Cesar E. Cortes, without leave to amend.

DATED: April 11, 2022                                   LITCHFIELD CAVO LLP

                                                        /s/ Mark K. Worthge
                                                By:     Mark K. Worthge
                                                        Alexandria K. Hobson
                                                        Attorneys for Defendant
                                                        University & State Employees Credit
                                                        Union

## CERTIFICATE OF SERVICE

*Cesare Cortes v. University & State Employees Credit Union*
*Case No. 37-2020-00018182-CU-BC-CTL*

I, the undersigned, declare that: I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the instant case. My business address is 2 North Lake Avenue, Suite 400, Pasadena, California 91101.

On **April 11, 2022**, I served the foregoing document described as **NOTICE OF MOTION AND MOTION TO DISMISS THE FIRST AMENDED COMPLAINT OF PLAINTIFF CESAR E. CORTES PURSUANT TO F.R.C.P. 12(b)(6)**

by serving a true copy of the above-described document in the following manner:

**BY ELECTRONIC FILING** I am familiar with the United States District Court, Southern District of California's practice for collecting and processing electronic filings. Under that practice, documents are electronically filed with the court. The court's CM/ECF system will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned judge, and any registered users in the case. The NEF will constitute service of the document. Registration as a CMIECF: user constitutes consent to electronic service through the court's transmission facilities. Under said practice, all parties to this case have been served electronically.

I declare that I am employed in the office of a member of the Bar of California, or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on **April 11, 2022** at Pasadena, California.

By: /s/ Yvette M. Gutierrez
Yvette M. Gutierrez