Richard D. McCune (State Bar No. 132124)
rdm@mccunewright.com
David C. Wright (State Bar No. 177468)
dcw@mccunewright.com
**MCCUNE LAW GROUP, APC**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250
Facsimile:   (909) 557 1275

Emily J. Kirk, *Pro Hac Vice*
ejk@mccunewright.com
**MCCUNE LAW GROUP, APC**
231 N. Main Street, Suite 20
Edwardsville, Illinois 62025
Telephone:  909.557.1250
Facsimile:   909.557.1275

Attorneys for Plaintiff Cesar Cortes
and the Putative Class

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CESAR E. CORTES, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY & STATE EMPLOYEES CREDIT UNION and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. 3:22-cv-00444-LAB-DEB<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>1. Violation of Electronic Fund Transfer Act (Regulation E, 12 C.F.R. §§ 1005, *et seq.*)<br>2. Violation of the California Unfair Competition Law (Bus. & Prof. Code, § 17200, *et seq.*)<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

1

Plaintiff Cesar E. Cortes ("Plaintiff"), by his attorneys, hereby brings this class and representative action against University & State Employees Credit Union and DOES 1 through 100 (collectively "USE Credit Union" or "Defendant").

## **NATURE OF THE ACTION**

1.     All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or his counsel.  Allegations pertaining to Plaintiff or his counsel are based upon, *inter alia*, Plaintiff or his counsel's personal knowledge, as well as Plaintiff or his counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.     Plaintiff has brought this class and representative action to assert claims in his own right and as the class representative of all other persons similarly situated.

3.      Defendant has violated and continues to violate federal and California law. First, Federal Reserve Regulation E, 12 C.F.R. §§ 1005, *et seq,* 15 U.S.C.A. §§ 1693 *et seq.* ("Regulation E") requires that before financial institutions charge overdraft fees on one-time debit card and ATM transactions, they must abide by certain requirements.

4.     A financial institution must first obtain affirmative consent from the consumer in order to charge any fees. The consumer must be provided the Opt-in Agreement before agreeing to opt-in. To qualify as affirmative consent, the Opt-in Agreement must clearly and accurately describe the overdraft program and include specific features of the overdraft program, including the standard overdraft practice and the enhanced overdraft program for debit card and ATM transactions.

5.     When the consumer is provided with the Opt-in Agreement, it must be presented as a standalone document and consent must be obtained separately from all other consents and acknowledgements.  The consumer's consent cannot serve any purpose other than opting into the Regulation E overdraft program. The consent cannot be given through a default pre-selected, checked box and the financial institution may not provide different terms for the account depending on whether or not the consumer opted

into the overdraft program.  The consumer's affirmative consent must be documented either with the consumer's signature, an affirmative "click" via online opt-in methods, or by a recording if opt-in is obtained by telephone.  The financial institution must provide the consumer with a confirmation that he or she opted in 1) after being provided the Opt-in Agreement, and 2) after being notified of the option to opt-out at any time.

6.     Regulation E also prohibits financial institutions from aggressively marketing their overdraft programs, making them appear as credit lines, or otherwise encouraging consumers to opt into their programs.

7.     Because Regulation E does not permit financial institutions to charge overdraft fees unless they obtain affirmative consent through an accurate disclosure of their overdraft services in a standalone Opt-in Agreement following proper procedures (which Defendant did not do), Defendant's assessment of all overdraft fees assessed against members for one-time debit card and ATM transactions has been and continues to be illegal.

8.     Defendant's violations are also actionable under California's Unfair Competition Law, California Business & Professions Code § 17200.

9.     This class action seeks statutory damages, monetary damages, restitution, and injunctive relief due to, *inter alia*, Defendant's violations of Regulation E and Section 17200.

## PARTIES

10.     Plaintiff Cesar E. Cortes is a resident of Chula Vista, California, and a member of Defendant at all relevant times.

11.     Based on information and belief, Defendant is and has been a state-chartered credit union with its headquarters located in San Diego, California.  Defendant is a "financial institution" within the meaning of Regulation E, 12 C.F.R. § 1005.2(i). On November 1, 2022, Defendant officially changed its name and started doing business as

Second Amended Class Action Complaint
Case No: 3:22-cv-00444-LAB-DEB

"BluPeak Credit Union."[1]

12.     Without limitation, defendants DOES 1 through 100, include agents, partners, joint ventures, subsidiaries, and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant's branch locations.  As used herein, where appropriate, the term "Defendant" is also inclusive of Defendants DOES 1 through 100.

13.     Plaintiff is unaware of the true names of Defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against Defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or the Court.

14.     There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise, or are mere instrumentalities of one another.

15.     At all material times herein, each Defendant was the agent, servant, co-conspirator, and/or employer of each of the remaining defendants; acted within the purpose, scope, and course of said agency, service, conspiracy, and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants; and ratified and approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

16.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives

---

[1] USE Credit Union Unveils New Name, BluPeak Credit Union, to Reflect their Broad and Diverse Membership and Commitment to Being a Top Employer (prnewswire.com) (last visited March 27, 2023.) However, since this is an amended pleading that relates back to Plaintiff's earlier filing, Plaintiff will consistently refer to Defendant by its name at the time the original pleading was filed.

1  who was actively engaged in the management, direction, control, or transaction of

2  Defendant's ordinary business and affairs.

3      17.    As to the conduct alleged herein, each act was authorized, ratified or

4  directed by Defendant's officers, directors, or managing agents.

5                    **JURISDICTION AND VENUE**

6      18.    This Court has subject matter jurisdiction over this case under 28 U.S.C. §

7  1331, 15 U.S.C. § 1693m, and 28 U.S.C. § 1367(a). This Court has supplemental

8  jurisdiction over Plaintiff's state-law claim, pursuant to 28 U.S.C. § 1367. This Court also

9  has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 under the

10 Class Action Fairness Act of 2005 because (i) there are 100 or more Class Members, (ii)

11 there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interests

12 and costs, and (iii) there is minimal diversity because at least one plaintiff and one

13 defendant are citizens of different States.

14     19.    Venue is proper in this District because Defendant maintains its

15 headquarters in this District, transacts business in this District, and Defendant executed

16 the unlawful policies and practices which are the subject matter of this action in this

17 District.

18                        **BACKGROUND**

19 **DEFENDANT**

20     20.    Defendant is a credit union with approximately six physical branches

21 throughout California.  According to its financial filings, as of December 31, 2022,

22 Defendant has 61,777 members, 146 full-time employees, and holds $1,240,251,197 in

23 assets. Defendant's members consist of California State and University employees, along

24 with others who live, work, or worship in the five counties of San Diego, Sacramento,

25 Yolo, Alameda, and Santa Clara. (https://www.usecu.org/home/our-story/who-we-are

26 [last visited March 22, 2023].)  It markets and sells itself as superior to banks, in no small

27 part through claims that it is not motivated by profit, but instead by service to its

28

5

members. *Id.* As will be discussed in the following, that statement is false relating to its overdraft practices.

## CHECKING ACCOUNTS DEFENDANT OFFERS TO MEMBERS

21. One of the main services Defendant offers to its members is a checking account. The checking account can increase or be credited in a variety of ways, including automatic payroll deposits; electronic deposits; incoming transfers; deposits at the branch; and deposits at ATM machines. Debits decreasing the amount in the checking account can be made by using a debit card for purchases of goods and services (point of sale purchases) that can be one-time purchases or recurring automatic purchases; through withdrawal of money at an ATM; or by electronic purchases. Additionally, some of the other ways to debit the account include writing checks; issuing electronic checks; scheduling Automated Clearing House (ACH) transactions (which can include recurring automatic payments or one-time payments); transferring funds; and other types of transactions that debit from a checking account. As of December 31, 2022, Defendant reported holding 37,351 checking accounts with a total balance of $371,723,812.

## CHECKING ACCOUNT OVERDRAFT FEES GENERATE SIGNIFICANT PROFIT FOR DEFENDANT

22. In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), Defendant assesses overdraft fees to member accounts when it claims to have determined that an account has been overdrawn. While Defendant does not publicly disclose the amount of overdraft fees and NSF fees it collects from its members, in December 2022 it reported collecting from all members $4,973,649 in service fee income. Based on information and belief, a significant portion of those service fees consist of overdraft fees that are collected from a small percentage of the overall credit union members.

## THE DETRIMENTAL EFFECT OF OVERDRAFT FEES

23. This case is about when and under what circumstances Defendant may charge an overdraft fee.

6

24.     The underlying principle for charging overdraft fees is that when the credit union pays a transaction by advancing the credit union's own funds to cover a member's insufficient funds, it may charge a *contracted* fee, provided that charging the fee is not prohibited by some legal regulation.  The fee Defendant charges here constitutes very expensive credit. According to the FDIC:

> For almost all study population banks operating an automated overdraft program, the main fee associated with the program was an NSF usage fee. Usage fees reported by these banks ranged from $10 to $38; the median fee was $27, charged on a per-transaction basis in almost all cases.  **In this context, a $27 fee charged for a single advance of $60 that was repaid in two weeks roughly translated into an APR of 1,173 percent.** Many surveyed banks (24.6 percent) assessed additional fees on accounts that remained in negative balance status in the form of flat fees or interest charged on a percentage basis.

(FDIC Study of Bank Overdraft Programs, 2008, https://www.fdic.gov/bank/analytical/overdraft/fdic138_report_final_v508.pdf [last viewed March 22, 2023] (emphasis added).)

25.     Overdraft fees constitute a primary revenue generator for banks and credit unions.  According to one banking industry market research company, Moebs Services, banks and credit unions in 2018 alone generated an estimated $34.5 billion on overdraft fees.  (Moebs Services, *Overdraft Revenue Inches Up in 2018* (March 27, 2019), http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%202018%200032719-1.pdf?ver=2019-03-27-115625-283 [last viewed March 22, 2023].)  A 2010 report by Georgetown University Law Professor Adam Levitin concluded that overdraft fees comprise 6% to 7% of the gross revenue of credit unions. (Filene Research Institute Report, Overdraft Regulation A Silver Lining In The Clouds? (Filene Research Institute 2010), https://ssrn.com/abstract=1544888 [last viewed March 22, 2023].)

26.     While credit unions portray themselves as more overdraft and fee friendly than banks—and that may have been historically true—it is not true now.  Moebs Services reported that 2018 credit union overdraft revenue jumped $500 million, even as

7

bank overdraft revenue declined by $400 million.  Further, the same study showed that credit unions generated significantly more revenue per customer in service fees than banks did.  (*See* Credit Union Times, *Overdraft Revenue Surges at Credit Unions: Moebs* (Jan. 7, 2019), https://www.cutimes.com/2019/01/07/overdraft-revenue-surges-at-credit-unions-moebs/ [last viewed March 22, 2023].)  And none of this is any surprise, because from 2000 to 2017 the average credit union overdraft fee increased from $15 to $29.  (MarketWatch, *The Average Credit Union Overdraft Fee Has Almost Doubled Since 2000* (March 27, 2017) https://www.marketwatch.com/story/credit-unions-charge-almost-as-much-as-major-banks-in-overdraft-fees-2017-03-24 [last viewed March 22, 2023].)

27.    Defendant's financial filings and practices reveal that it has followed these trends to the letter.  Defendant charges an overdraft/NSF fee of $27. Even if Defendant had been properly charging overdraft fees, the $27 fees bear no relation to the credit union's minute risk of loss or cost for administrating the Defendant's overdraft services. Nevertheless, the practical effect of the fee is to charge those who pay it an interest rate with an APR in the thousands.

28.    Accordingly, the overdraft fee is a punitive fee rather than a service fee, which makes it even more unfair because most account overdrafts are accidental and involve a small amount of money in relation to the fee. Further, in a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their accounts by mistake.  (Pew Charitable Trust Report, *Overdraft America: Confusion and Concerns about Bank Practices*, at p. 4 (May 2012), https://www.pewtrusts.org/ /media/legacy/uploadedfiles/pcs_assets/2012/sciboverdraft20america1pdf.pdf [last viewed March 22, 2023].)  More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  (Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014), https://www.pewtrusts.org/- /media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf [last viewed March 22, 2023].)  More than 50% of those who were assessed overdraft fees do not recall

8

opting into an overdraft program, (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than being charged a very large fee, (*id*. at p. 10).

29.    Finally, the financial impact of these fees falls on the most vulnerable among the banking population with the least ability to absorb the overdraft fees.  Younger, lower-income, and non-white account holders are among those most likely to be assessed overdraft fees.  (*Id*. at p. 1.)  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  (*Id*. at p. 3.)  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  (*Id*. at p. 4.)  And non-whites are 83% more likely to pay an overdraft fee than whites.  (*Id*. at p. 3.)

**THE REGULATORY RESPONSE TO THE HARM CAUSED TO CONSUMERS BY OVERDRAFT FEES**

30.    In response to financial institutions' use of overdraft fees as profit centers at the expense of vulnerable consumers, the federal government stepped in to provide additional protections to consumers with respect to overdraft policies.  The regulations relevant to overdraft fees are found in the Truth in Savings Act ("TISA") directed specifically at credit unions, found at 12 C.F.R. § 707.1, *et seq*. and the Electronic Fund Transfer Act ("Regulation E"), 12 C.F.R. § 1005, *et seq*.

**TISA REQUIREMENTS**

31.    The purpose of TISA is to allow credit unions and potential members to make informed decisions about accounts.  (12 C.F.R. § 707.1(b).)  Disclosures must be presented in a format allowing members to readily review the terms of the account and use consistent terminology to describe terms, which would include the overdraft terms in the account disclosure, Opt-in Agreement, and monthly statements.  (12 C.F.R. § 707.3.)

32.    When a credit union promotes the payment of overdrafts in advertisements, it must do so accurately, clearly, and conspicuously.  (12 C.F.R. § 707.8; 12 C.F.R. § 707.11 (b).)  In its account disclosure, a credit union must specifically authorize the fee it is charging, (12 C.F.R. § 707.4(b)(4)), and it must *list the conditions* under which the fee

1   may be imposed.  (*Id*. (emphasis added).)  It must also list the various types of

2   transactions that may be subject to an overdraft.  (12 C.F.R. § 707, App. C.)

3       33.     Defendant has violated TISA in regard to Plaintiff by, among other things,

4   providing an Opt-in Agreement that fails to clearly and conspicuously identify its true

5   overdraft practices.

6   **REGULATION E REQUIREMENTS**

7       34.     In 2010, the Federal Reserve Board enacted regulations giving financial

8   institutions the authority to charge overdraft fees on ATM and one-time debit card

9   transactions **only** if the institution first obtained the consumer's affirmative consent. (12

10  C.F.R. § 1005.17 (Regulation E's "Opt-in Rule").)  The special treatment provided for

11  these transactions was supported by the CFPB study of actual practices that found: 1)

12  ATM and debit card transactions are by far the most frequently-occurring transactions;

13  2) overdraft fee policies entail expensive fees at very little risk to the financial

14  institutions; and 3) opted-in accounts have seven times as many overdrafts that result in

15  fees as not opted-in accounts.  (CFPB, *Data Point: Checking Account Overdraft,* (July

16  2014), https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf

17  [last viewed March 22, 2023].)

18      35.     The Federal Reserve's regulations specified what banks and credit unions

19  had to do in order to comply with Regulation E and charge overdraft fees on one-time

20  debit card and ATM transactions.  They must first obtain affirmative consent from the

21  consumer in order to charge any fees, and the affirmative consent must be obtained

22  strictly in compliance with the Regulation E requirements.  First, the consumer must be

23  provided the Opt-in Agreement before agreeing to opt-in.  To qualify as affirmative

24  consent, the Opt-in Agreement must clearly and accurately describe the overdraft

25  program and include specific features of the overdraft program, including the standard

26  overdraft practice and the enhanced overdraft program for debit card and ATM

27  transactions.

28

36.     When the consumer is provided with the Opt-in Agreement, it must be presented as a standalone document and consent must be obtained separately from other consents and acknowledgements.  The consumer's consent cannot serve any purpose other than opting into the Regulation E overdraft program. The consent cannot be given through a default pre-selected, checked box and the financial institution may not provide different terms for the account depending on whether or not the customer opted into the overdraft program.  The consumer's affirmative consent must be documented either with the consumer's signature, an affirmative "click" via online opt-in methods, or by a recording if opt-in is obtained by telephone.  The financial institution must provide the consumer with a confirmation that he or she opted in 1) after being provided the Opt-in Agreement, and 2) after being notified of the option to opt-out at any time.

37.     Financial institutions are not permitted to include any additional information in the Opt-in Agreement unless specifically authorized by Regulation E, and financial institutions must ensure these procedures are followed no matter the medium used to offer consumers the option to opt-in, whether online, by telephone, or in person at a branch. Furthermore, financial institutions are also prevented from aggressively marketing the benefits of Regulation E overdraft coverage, promoting their overdraft coverage as short-term credit programs, or otherwise encouraging consumers to opt into their programs.

38.     If the financial institution fails to obtain proper, affirmative consent from the consumer in a manner that meets all of Regulation E's requirements, it may not charge any overdraft fees on ATM and one-time debit card transactions.

39.     Here, Defendant committed numerous Regulation E violations including, but not limited to, using an Opt-in Agreement that misinformed members about both its standard overdraft policies and the Regulation E-specific overdraft policies by falsely stating that overdrafts were assessed only when there was not enough money in an account to cover a transaction and Defendant paid the transaction anyway (actual "balance"), when instead, the Defendant used the bookkeeping artificial "available

11

balance" to assess overdraft fees;[2] improperly marketing its overdraft program; failing to provide the Opt-in Agreement to consumers as a standalone document; failing to provide confirmation to consumers of their decision to opt-in and/or maintain records of consumers' opt-in status; and failing to properly opt-in members to the program via certain mediums.  As such, Defendant was not authorized to charge Plaintiff or other members any overdraft fees on one-time debit card or ATM transactions.

**HOW SOME BANKS AND CREDIT UNIONS HAVE DISCLOSED THEIR USE OF AVAILABLE BALANCE RATHER THAN THE ACTUAL BALANCE TO ASSESS OVERDRAFT FEES IN REGULATION E OPT-IN AGREEMENTS**

40.     Numerous banks and credit unions that utilize the artificial "available balance" rather than the money in the account ("balance") to assess overdraft fees contract and affirmatively disclose this practice in their Opt-in Agreements.  As just one example, TD Bank's Opt-in Agreement states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway. Your available balance is reduced by any 'pending' debit card transactions (purchases

---

[2] Banks and credit unions often calculate two account balances for consumer checking accounts. The "actual balance," "ledger balance," "current balance" or even "balance" are all terms used to describe the actual amount of the accountholder's money in the account at any particular time. In contrast, the "available balance" is a term of art the financial industry uses to describe the actual balance artificially reduced by the amount the bank or credit union says is subject to a deposit hold or that is held due to authorized but unposted debit card transactions. Notably, however, all money subject to holds remains in the account. Financial institutions are free to decide which balance to use when determining overdraft fees. But, per Regulation E, the terms of the overdraft program must be clearly and accurately disclosed. Whether the financial institution uses the actual money in the account or some other artificial balance to assess overdraft fees must be made clear to consumers as it is material information the consumer needs to understand the overdraft program.  Prior investigation in similar lawsuits demonstrates that by using the available balance, instead of actual balance, financial institutions increase the number of overdraft transactions by approximately 10-20%. What happens in those 10-20% of transactions is that sufficient funds are in the account to pay the transaction and therefore the bank or credit union does not need to advance any funds to the consumer to complete the payment. At all times, the financial institution uses the consumer's own money to pay the transaction, which really means there has never been an overdraft at all—yet the financial institution charges an overdraft fee on the transaction anyway.

and ATM withdrawals), and includes any deposited funds that have been made available pursuant to our Funds Availability Policy."

41.    As another example, Credit Union 1, a credit union with over 87,000 members, states in its Opt-in Agreement, "[a]n overdraft occurs when you do not have enough available money (i.e., less any holds) in your checking account to cover a transaction, but we pay it anyway."

42.    Similarly, Communication Federal Credit Union's Opt-in Agreement states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, or the transaction exceeds your available balance, but we pay it anyway. 'Available Balance' is your account balance less any holds placed on your account."

43.    Further, the Opt-in Agreement for San Diego County Credit Union, recognizing that "available balance" is at best an ambiguous term, explains on the same page, as follows: "In determining the available balance in your account, we will consider all transactions that have posted to your account, any holds that may be in place on deposits you have made and pending transactions (such as pending debit card purchases) that [have been] authorized but that have not yet posted to your account."

44.    The Opt-in Agreement for EECU explains for five-pages on the same form requiring signature, pursuant to Regulation E for overdraft coverage, including on page two, that "Your available balance takes into account holds that have been placed on deposits and pending transactions (such as pending debit card transactions) that the credit union has authorized but that have not yet posted to your account. **In other words, the available balance is [your] actual balance less any pending ATM withdrawals, debit card purchases, ACH transaction, checks being processed or other pending withdrawals from [your] account and less any deposits that are not yet available due to the credit union's funds availability policy."** (Emphasis in original.)

45.    There are countless other examples of financial institutions accurately explaining the basis for imposing overdraft fees in their Opt-in Agreements.  Financial institutions can accurately describe their overdraft programs in their Opt-in Agreements

13

and Regulation E does not preclude them from doing so.  When they fail to accurately describe, mislead, or misrepresent their overdraft policies in their Opt-in Agreements, financial institutions violate Regulation E and engage in unfair business practices. Further, financial institutions that fail to comply with other requirements of Regulation E as laid out in Paragraphs 34-39, *supra*, have not obtained the affirmative consent needed to assess any overdraft fees as governed by Regulation E.

46.     The importance of transparent checking account fee disclosures for both comparison shopping prior to opening an account, and avoiding overdraft and other fees after opening an account, are foremost:

> Bank accounts are an essential financial product, used by 9 in 10 American households, and need to be safe and transparent. Account agreements and fee schedules provide customers with account costs, terms, and conditions.  Among the largest U.S. banks, however, the median length of checking account disclosure documents is 40 pages, and the information is presented in varied formats with inconsistent wording, making it difficult for consumers to easily find the information they need to comparison shop, avoid overdraft and other fees, and manage their money.

(The Pew Charitable Trusts, *The Benefits of Uniform Checking Account Disclosures,* at p. 1 (Nov. 2015), (internal footnotes omitted), https://www.pewtrusts.org/-/media/assets/2015/11/consumerbanking_accountdisclosurebrief.pdf  [last viewed March 22, 2023].)

47.     Financial institutions have also been put on notice by regulators, banking associations, their insurance companies and risk management departments, and from observing litigation and settlements that the practice of using the available balance instead of the actual amount of money in the account (i.e., the actual, ledger, or current balance) to calculate overdrafts without clear disclosure of that practice likely violates Regulation E and other state laws. For instance, the FDIC stated in 2019:

> Institution's processing systems utilize an "available balance" method or "ledger balance" method to assess overdraft fees. The FDIC identified issues regarding certain overdraft programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC

14

examiners observed potentially unfair or deceptive practices when institutions using an available balance method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.

The CFPB provided in its Winter 2015 Supervisory Highlights that:

A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in result in an overdraft (and an overdraft fee) under an available-balance method. At one or more financial institutions, examiners noted that these changes to the calculation method used were not disclosed at all, or were not sufficiently disclosed, resulting in customers being misled as to the circumstances under which overdraft fees would be assessed. Because these misleading practices could be material to a reasonable consumer's decision making and actions, they were found to be deceptive.

48.     Under Regulation E, the financial institution may decide which balance it chooses to use for overdraft fees on one-time debit card and ATM transactions, but it is also very clear that it must disclose this practice accurately, clearly and in a way that is easily understood. As the Regulation E Opt-in Agreement must include this information in a standalone document, the use of available balance must be stated and explained in the Opt-in Agreement to conform to Regulation E and permit the financial institution to charge any overdraft fees on one-time debit card and ATM transactions, and courts have come down heavy on banks and credit unions that have failed to accurately describe and misrepresent their overdraft fee practices.

## **FACTUAL ALLEGATIONS AGAINST DEFENDANT**

49.     At all relevant times, Defendant has had a Regulation E overdraft program that does not comply with Regulation E, and which creates an unfair business practice under California law.

15

50.     Defendant entered into an identical Regulation E Opt-in Agreement with Plaintiff and all putative Class Members who wanted to join Defendant's Regulation E overdraft program.  The Opt-in Agreement defined an overdraft as occurring when "you do not have enough money in your account to cover a transaction, but [Defendant] pay[s] it anyway." [*See* USE Opt-in Agreement, Ex. 1].

51.     This definition of overdraft would disclose and be interpreted by reasonable members to mean as follows: (1) "do not have the money in your checking account" means the Actual balance/Current Balance/Ledger Balance in the account, and (2) "we will pay the item" means that Defendant has advanced or loaned the member its own money to pay the transaction. However, as Defendant determines overdraft fees based on the "available balance" that factors in credit and debit holds, approximately 10-20% of overdraft fees are assessed on transactions when there was money in the account to cover the transaction at the time it was posted and paid, and Defendant did not advance or loan the member any money to pay the transaction.

52.     Given Defendant's decision to use the "available balance" to assess overdraft fees on Regulation E transactions, the Opt-in Agreement did not accurately and in a clear and easily understandable way describe what constitutes an overdraft and under what circumstances the member would be assessed an overdraft fee, and as such the Opt-in Agreement does not comply with Regulation E's requirements.

53.     Several of Defendant's other practices also violate Regulation E.  Regulation E discourages financial institutions from aggressively marketing their overdraft programs, or making them appear as credit lines.  But in total disregard for Regulation E, Defendant's training materials for member-facing employees actively encourage employees to promote Defendant's overdraft program.  These materials focus solely on the benefits of the overdraft coverage but not the detriments, including the exorbitant fees.  Defendant also improperly markets its overdraft program as a line of credit. Defendant discloses its overdraft coverage limit to members (which ranges from $250-$2,000 depending on account type), which encourages members to utilize the coverage

like a credit line. Notably, the Office of the Comptroller of the Currency, Treasury (OCC); Board of Governors of the Federal Reserve System (Board); Federal Deposit Insurance Corporation (FDIC); and National Credit Union Administration (NCUA) issued a Joint Guidance cautioning financial institutions from "promoting overdrafts in a manner that leads consumers to believe that it is a line of credit by informing consumers that their account includes an overdraft protection limit of a specified dollar amount." *See* Joint Guidance on Overdraft Protection Programs, 70 FR 9127-01.  If a limit is included, the Joint Guidance counseled that disclosures should also "clearly disclos[e] the terms and conditions of the service, including how fees reduce overdraft protection dollar limits, and how the service differs from a line of credit." *Id.*  Further, Defendant's overdraft program allows members 14 days to repay, making it appear as a short-term credit facility rather than a fee-based courtesy.  In addition, before a member qualifies for courtesy pay, he or she must have a certain score assigned by the Chex System, which takes into account at least certain aspects of traditional credit scoring, further increasing the similarity to a credit line.

54.     Regulation E also requires financial institutions to follow certain procedures when they opt-in consumers to Regulation E overdraft coverage for one-time debit card and ATM transactions.  For instance, consumers must be provided the Opt-in Agreement as a standalone document prior to a consumer opting-in.  However, for at least those members of Defendant who opt into Regulation E coverage by telephone, Defendant does not read or otherwise provide them the language in the Opt-in Agreement before they affirmatively consent to be included in the program.  And when members opt-in online, there is no requirement that they have to open the Opt-in Agreement and read its provisions before opting-in.  Both of these violate Regulation E's requirement that consumers be provided the Opt-in Agreement prior to opt-in.  Moreover, on information and belief, Defendant does not segregate the Opt-in Agreement from other account opening disclosures, thus failing to present it as a standalone document, and fails to provide members with a copy of their signed Opt-in Agreements or confirmation letters,

as required by Regulation E.[3]  Discovery is ongoing and further Regulation E violations may be discovered and included in Plaintiff's claim against Defendant for violation of Regulation E.

55.     Plaintiff and the putative Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the Opt-in Agreement.

56.     Meanwhile, Plaintiff and the putative Class Members could not reasonably have anticipated the harm resulting from Defendant's practice throughout the class period.  The money in the account, without deductions for holds on pending transactions or on deposits, as already stated, is known as the "balance," and is considered the official balance of the account.  It is the balance provided to members in monthly statements, which is the official record of activity in the account.  It is the balance Defendant uses to determine interest on deposits and any minimum balance requirements; the balance Defendant uses to report its deposits to regulators, shareholders, and the public; the balance Defendant provides to regulators in call reports and reserve reports; the balance Defendant uses in financial reports to shareholders; and the balance Defendant uses for internal financial reporting.  When Defendant refers to "money in the account" it is reasonable to interpret and understand these terms as referring to the account's official balance—the balance without deducting for pending debit card transactions or holds on deposits.  The Opt-in Agreement fails to accurately describe Defendant's overdraft policies which are based on use of the "available balance" because it describes use of the actual balance for overdraft fee assessments.  Thus, by assessing overdraft fees on one-time debit card and ATM transactions using the available balance, Defendant violated Regulation E.  Defendant further violated the statute by failing to follow proper opt-in procedures, and by aggressively marketing the benefits of the overdraft program (including promoting it like a credit line).  Because Defendant violated Regulation E, it

---

[3] Defendant has not provided Plaintiff with a copy of his signed Opt-in Agreement or the confirmation letter that purportedly would have been sent to him, thus raising concern that this may not have been a routine practice in further violation of Regulation E.

1  was not entitled to assess any overdraft fees on one-time debit card and ATM

2  transactions.

3       57.    In its study, the CFPB concluded that when a financial institution creates the

4  "overall impression" that it will determine overdraft transactions and fees based on the

5  balance in the account rather than an artificially created balance deducting pending

6  transactions, then the "disclosures were misleading or likely to mislead, and because such

7  misimpressions could be material to a reasonable consumer's decision-making and

8  actions, examiners found the practice to be deceptive."  The CFPB further found that

9  "consumers could not reasonably avoid the fees (given the misimpressions created by the

10 disclosures)."  (CFPB, *Supervisory Highlights*, at p. 9 (Winter 2015),

11 https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf

12 [last viewed March 22, 2023].)

13      58.    Further, a Federal Interagency Compliance Discussion regarding improper

14 overdraft fees, the CFPB condemned exactly the conduct Plaintiff challenges in this

15 lawsuit, and called what Defendant is doing here during the relevant class period an

16 "Unfair Practice":



26 (Excerpts from Interagency Overdraft Services Consumer Compliance Discussion

27 Presentation Slides, dated Nov. 9, 2016,

28 https://www.consumercomplianceoutlook.org/outlook-live/2016/interagency-overdraft-

services-consumer-compliance-discussion/ [last viewed March 22, 2023].)

59.     Therefore, Plaintiff, on behalf of himself and all others similarly situated, seeks relief as set forth below.

**PLAINTIFF HAS BEEN DAMAGED AND HAS STANDING TO BRING THIS LAWSUIT**

60.     Plaintiff and the putative Class Members were harmed by Defendant's policy and practice of charging overdraft fees in violation of regulations and statutes.  It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee. However, by way of example, on or about May 23, 2021, Plaintiff made a one-time debit card payment in the amount of $600.00, and Defendant charged Plaintiff a $27.00 "Courtesy Pay Overdraft Fee."  In addition, or about May 24, 2021, Plaintiff made a one-time debit card payment in the amount of $100.00, and Defendant charged Plaintiff a $27.00 "Courtesy Pay Overdraft Fee."  Because Defendant failed to comply with Regulation E and/or TISA, as well as California law, Defendant failed to obtain Plaintiff's affirmative consent and Defendant should not have assessed any overdraft fees on one-time debit card or ATM transactions. Plaintiff has a reasonable belief that discovery and a complete review of Defendant's records, including Plaintiff's monthly statements and transaction history, will show multiple instances in which Defendant improperly charged Plaintiff overdraft fees.

**CLASS ACTION ALLEGATIONS**

61.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

62.     Plaintiff brings this case, and each of his respective causes of action, as a class action.

63.     The "Class" is composed of one of the following:

**The Regulation E Class:**

> **All members of Defendant who have or have had accounts with Defendant who incurred an overdraft fee(s) for ATM or non-recurring debit card transaction(s) during the**

20

1

**period beginning March 17, 2021, and ending on the date the Class is certified.**

2

**The UCL Class:**

3

**All members of Defendant who have been assessed
overdraft fees that were in violation of the Opt-in
Agreement, TISA, and/or Regulation E, pursuant to
California Unfair Competition Law, Bus. & Prof. Code, §§
17200, *et seq.*, during the class period beginning four years
preceding the filing of the Complaint and ending on the
date the Class is certified.  Following discovery, this
definition will be amended as appropriate.**

4

5

6

7

8        64.     Excluded from the Classes are: 1) any entity in which Defendant has a

9  controlling interest; 2) officers or directors of Defendant; 3) this Court and any of its

10 employees assigned to work on the case; and 4) all employees of the law firms

11 representing Plaintiff and the putative Class Members.

12       65.     This action has been brought and may be properly maintained on behalf of

13 each putative member of the Class pursuant to Federal Rules of Civil Procedure, Rule 23.

14       66.     **<u>Numerosity</u>** – The members of the Classes are so numerous that joinder of

15 all members would be impracticable.  While the exact number of Class Members is

16 presently unknown to Plaintiff, and can only be determined through appropriate

17 discovery, Plaintiff believes based on the percentage of customers that are harmed by

18 these practices with credit unions with similar practices, that the Classes are likely to

19 include thousands of members.

20       67.     Upon information and belief, Defendant has databases, and/or other

21 documentation, of its members' transactions and account enrollment.  These databases

22 and/or documents can be analyzed by an expert to ascertain which of Defendant's

23 members has been harmed by its practices and thus qualify as a Class Member.  Further,

24 the Class(es) definitions identify groups of unnamed plaintiffs by describing a set of

25 common characteristics sufficient to allow a member of that group to identify himself or

26 herself as having a right to recover.  Other than by direct notice through mail or email,

27 alternative proper and sufficient notice of this action may be provided to the Class

28 Members through notice published in newspapers or other publications.

68. **Commonality –** This action involves common questions of law and fact. The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

- whether, pursuant to the Opt-in Agreement, Defendant promised Plaintiff and the Class Members that it would not charge an overdraft fee when there was enough money in the account to cover a transaction, and Defendant used no money of its own to pay the transaction;

- whether "enough money in the account" means that the actual account balance will be used to assess overdraft fees; and

- whether Defendant's conduct violated Regulation E, TISA, and/or state consumer protection laws.

69. **Typicality –** Plaintiff's claims are typical of all Class Members.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because the Opt-in Agreement between Defendant and its members was identical as to all relevant terms, and also because, *inter alia*, the challenged practice of charging overdraft fees in violation of its Opt-in Agreement, TISA, and/or Regulation E is uniform for Plaintiff and all Class Members.  Accordingly, in pursuing his own self-interest in litigating his claims, Plaintiff will also serve the interests of the other Class Members.

70. **Adequacy –** Plaintiff will fairly and adequately protect the interests of the Class Members.  Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Classes that would make class certification inappropriate.  Plaintiff and his counsel intend to prosecute this action vigorously.

71. **Predominance and Superiority –** The matter is properly maintained as a class action because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual

Class Members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class Members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for Defendant's wrongful conduct. Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Classes and would lead to repetitious trials of the numerous common questions of fact and law.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of its ill-gotten gains.

72.     Plaintiff is not aware of any separate litigation instituted by any of the putative Class Members against Defendant.  Plaintiff does not believe that any other Class Members' interests in individually controlling a separate action are significant, in that Plaintiff has demonstrated above that his claims are typical of the other Class Members and that he will adequately represent the Class.  This particular forum is desirable for this litigation because Defendant's headquarters are located in this District and the claims arose from activities that occurred largely in this District.  Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in

1  dispute are susceptible to class proof.

2      73.    Plaintiff anticipates the issuance of notice, setting forth the subject and

3  nature of the instant action, to the proposed Class Members.  Upon information and

4  belief, Defendant's own business records and/or electronic media can be utilized for the

5  contemplated notices.  To the extent that any further notices may be required, Plaintiff

6  anticipates using additional media and/or mailings.

7      74.    This matter is properly maintained as a class action pursuant to Federal

8  Rules of Civil Procedure, Rule 23 in that without class certification and determination of

9  monetary, injunctive, statutory and other legal questions within the class format,

10  prosecution of separate actions by individual members of the Classes will create the risk

11  of:

12      • inconsistent or varying adjudications with respect to individual members of

13        the Classes which would establish incompatible standards of conduct for the

14        parties opposing the Classes; or

15      • adjudication with respect to individual members of the Classes would, as a

16        practical matter, be dispositive of the interests of the other members not

17        parties to the adjudication or substantially impair or impede their ability to

18        protect their interests.

19      75.    Common questions of law and fact exist as to the members of the Classes

20  and predominate over any questions affecting only individual members, and a class

21  action is superior to other available methods of the fair and efficient adjudication of the

22  controversy, including consideration of:

23      • the interests of the members of the Classes in individually controlling the

24        prosecution or defense of separate actions;

25      • the extent and nature of any litigation concerning the controversy already

26        commenced by or against members of the Classes;

27      • the desirability or undesirability of concentrating the litigation of the claims

28        in the particular forum; and

Second Amended Class Action Complaint
Case No: 3:22-cv-00444-LAB-DEB

- the difficulties likely to be encountered in the management of a class action.

## FIRST CAUSE OF ACTION
### (Violation of Electronic Fund Transfer Act (Regulation E), 12 C.F.R. §§ 1005, *et seq.*, (authority derived from 15 U.S.C. §§ 1693, *et seq.*))

76.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

77.   By charging overdraft fees on ATM and nonrecurring debit card transactions, Defendant violated Regulation E, 12 C.F.R. §§ 1005, *et seq.*, whose "primary objective" is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act [15 U.S.C. §§ 1693, et seq.], the 'EFTA,'" 12 C.F.R. § 1005.1(b)).

78.   Specifically, the charges violated what is known as the "Opt-in Rule" of Regulation E. 12 C.F.R. § 1005.17. The Opt-in Rule states: "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program. *Id.* (emphasis added). The notice "shall be clear and readily understandable." 12 C.F.R. § 1005.4(a)(1). To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.  Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account.

79.   The intent and purpose of this Opt-in Agreement is to "assist customers in understanding how overdraft services provided by their institutions operate . . . by

explaining the institution's overdraft service . . . in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 59040, 59048, which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

80.     Defendant failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess any overdraft fees against members' accounts through an overdraft program for ATM and nonrecurring debit card transactions. Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including by failing to provide its members in a "clear and readily understandable way" a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Defendant's opt-in method fails to satisfy 12 C.F.R. § 1005.17 because, *inter alia*, it states that an overdraft occurs when there is not enough money in the account to cover a transaction but Defendant pays it anyway, when, in fact, Defendant assesses overdraft fees when there is enough money in the account to pay for the transaction at issue and Defendant needs to advance no funds at all.  This is accomplished by using the internal bookkeeping available balance to assess overdraft fees, rather than the actual and official balance of the account.  Defendant failed to use language to describe the overdraft service that identified that it was using the available balance to assess overdraft fees, which meant that in a significant percentage of transactions that were the subject of the overdraft fee, there was money in the account to cover the transaction and Defendant did not have to advance any money – yet Defendant assessed an overdraft fee anyway.

81.     Defendant committed numerous other Regulation E violations including, but not limited to, aggressively marketing its overdraft program touting only its benefits

without disclosing the detriments and making it appear as though use of the program operated as a credit line.  Defendant also failed to use proper opt-in procedures by failing to provide those members who opted in by telephone or online with a copy of the Opt-in Agreement before they provided affirmative consent to be included in the program.  Finally, Defendant may have failed to provide its members with a standalone Opt-in Agreement or provide them with proper confirmation of their decisions to opt-in as required by Regulation E.

82.  As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and nonrecurring debit card transactions without obtaining affirmative consent to do so, Defendant was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions, and it has harmed Plaintiff and the Class Members by assessing overdraft fees on one-time debit card and ATM transactions.

83.  As the result of Defendant's violations of Regulation E, 12 C.F.R. § 1005, *et seq.*, Plaintiff and members of the Class are entitled to actual damages, including all overdraft fees improperly assessed as a result of violating Regulation E, statutory damages of up to $500,000.00 for *each* failure to comply with Regulation E, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C.A. § 1693m.  The actual and statutory damages based on the number of violations per person will be proven and decided at trial.

**SECOND CAUSE OF ACTION**
**(Violation of California Unfair Competition Law, Bus. & Prof. Code,**
**§§ 17200, *et seq.*)**

84.  The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

85.  Defendant's conduct described herein violates California's Unfair Competition Law (the "UCL"), codified at Business and Professions Code section 17200, *et seq*.  The UCL prohibits, and provides civil remedies for, unlawful and unfair competition.  Its purpose is to protect both consumers and competitors by promoting fair

27

competition in commercial markets for goods and services.  In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.  By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to serve as the basis of an independently actionable unfair competition claim, and sweeps within its scope acts and practices not specifically proscribed by any other law.

86.    The UCL expressly provides for injunctive relief, and contains provisions denoting its public purpose.  Although the private litigant controls the litigation of an unfair competition claim, he or she is not entitled to recover compensatory damages for his or her own benefit, but only disgorgement of profits made by the defendant through unfair or deceptive practices in violation of the statutory scheme, or restitution to victims of the unfair competition.

87.    As further alleged herein, Defendant's conduct violates the UCL's "unfair" prong insofar as Defendant charges overdraft fees in violation of the public policy and/or text of TISA and/or Regulation E.  Defendant's conduct was not motivated by any legitimate business or economic need or rationale.  The harm and adverse impact of Defendant's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives.  The harm to Plaintiff and Class Members arising from Defendant's unfair practices relating to the imposition of the improper fees outweighs the utility, if any, of those practices.

88.    Defendant's unfair business practices as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff, Class Members, and the general public.  Defendant's conduct was substantially injurious to consumers in that they have been forced to pay improper, abusive, and/or unconscionable overdraft fees.

89.    Moreover, Defendant's conduct also violates the UCL's unlawful prong to the extent Defendant violated Regulation E and/or TISA by failing to accurately describe the circumstances when Plaintiff and Class Members would be assessed an overdraft fee,

1  and committing other opt-in violations of Regulation E.

2       90.     Regulation E provides: "a financial institution . . . *shall not assess a fee or*

3  *charge* . . . pursuant to the institution's overdraft service, *unless* the institution: (i)

4  [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the*

5  *institution's overdraft service*," and (ii) "[p]rovides a reasonable opportunity for the

6  consumer to *affirmatively consent*" to enter into the overdraft program.  (*Id*.)  The notice

7  "shall be clear and readily understandable."  (12 C.F.R. § 205.4(a)(1).)  To comply with

8  the affirmative consent requirement, a financial institution must provide a segregated

9  description of its overdraft practices that is accurate, non-misleading and truthful and that

10  conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a

11  reasonable opportunity to opt-in after receiving the description.  The affirmative consent

12  must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution

13  must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. §

14  1005.17.  The intent and purpose of this is to "assist customers in understanding how

15  overdraft services provided by their institutions <u>operate</u> . . . by <u>explaining</u> the institution's

16  overdraft service . . . in a <u>clear and readily understandable way</u>"—as stated in the Official

17  Staff Commentary, (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the

18  CFPB's official interpretation of its own regulation," and "warrants deference from the

19  courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive

20  interpretation" of Regulation E.  (*Strubel v. Capital One Bank* (USA) (S.D. N.Y. 2016)

21  179 F.Supp.3d 320 (quoting *Chase Bank USA v. McCoy* (2011) 562 U.S. 195, 211) (so

22  holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg

23  Z).)

24       91.     Here, Defendant has violated the unlawful prong of California's UCL as a

25  result of violating Regulation E's prohibitions against using an Opt-in Agreement that

26  misinformed customers about both the standard overdraft policies and the Regulation E

27  specific overdraft policies by falsely stating that overdrafts were assessed only when

28  there was not enough money to cover the transaction (actual "balance") when instead the

Defendant used the bookkeeping artificial "available balance" to assess overdraft fees. Defendant further improperly advertised/marketed its overdraft program in violation of Regulation E and did not follow proper procedures when opting-in members by telephone and online.  Further, Defendant may not have routinely provided members with proper confirmation of their decision to opt-in or segregate the Opt-in Agreement from other account disclosures.

92.     In addition, under TISA, credit union disclosures must be presented in a format allowing members to readily review the terms of the account and use consistent terminology to describe terms, which includes the overdraft terms in the account disclosure, Opt-in Agreement and monthly statements.  (12 C.F.R. § 707.3.)  When a credit union promotes the payment of overdrafts in advertisements, it must do so accurately, clearly, and conspicuously.  (12 C.F.R. § 707.8; 12 C.F.R. § 707.11 (b).) Further, in its account disclosure, a credit union must specifically authorize the fee it is charging, 12 C.F.R. § 707.4(b)(4), and it must *list the conditions* under which the fee may be imposed.  (*Id.* (emphasis added).)  It must also list the various types of transactions that may be subject to an overdraft.  (12 C.F.R. § 707, App. C.)

93.     Defendant has violated the unlawful prong of California's UCL as a result of violating TISA by, among other things, providing an inaccurate Opt-in Agreement and failing to clearly and conspicuously identify its true overdraft practices and fees.

94.     As a result of Defendant's violations of the UCL, Plaintiff and Class Members have paid improper overdraft fees and thereby have suffered actual loss of money.  Further, absent injunctive relief forcing Defendant to disgorge itself of its ill-gotten gains and public injunctive relief prohibiting Defendant from misrepresenting and omitting material information concerning its overdraft fee policy and failing to properly follow opt-in requirements at issue in this action in the future, Plaintiff and other existing accountholders, and the general public, will suffer from and be exposed to Defendant's conduct violative of the UCL.

## **PRAYER**

WHEREFORE, PLAINTIFF and CLASS MEMBERS pray for judgment as follows:

    a.  For an order certifying this action as a class action;

    b.  For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

    c.  For monetary and/or actual damages;

    d.  For statutory damages;

    e.  For an order enjoining the wrongful conduct alleged herein;

    f.  For costs;

    g.  For pre-judgment and post-judgment interest as provided by law;

    h.  For attorneys' fees under the Civil Code section 1021.5 and the Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

    i.  For such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

PLAINTIFF, on behalf of himself, and all others similarly situated, demands a jury trial with respect to all issues triable of right by jury.

DATED:  March 27, 2023

Respectfully submitted,

MCCUNE LAW GROUP, APC

By: _[signature]_

Richard D. McCune, CA Bar No. 132124
rdm@mccunewright.com
David C. Wright, CA Bar No. 177468
dcw@mccunewright.com
McCUNE LAW GROUP, APC
3281 East Guasti Road, Suite 100
Ontario, California 91761
Tel: (909) 557-1250 Fax: (909) 557-1275

Attorneys for CESAR E. CORTES individually, and on behalf of all others similarly situated